**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 19 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL EDWARD HOOPER,

      Petitioner-Appellant-
Cross-Appellee,

v.

MIKE MULLIN, [*] Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee-
Cross-Appellant.

Nos. 01-6238 and 01-6242

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 98-CV-1380-M)**

---

Mark L. Henricksen (Lanita Henricksen with him on the brief), of Henricksen &
Henricksen Lawyers, Inc., El Reno, Oklahoma, for Petitioner-Appellant-
Cross-Appellee.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma, with him on the brief), Oklahoma City,
Oklahoma, for Respondent-Appellee-Cross-Appellant.

---

Before **SEYMOUR** , **BALDOCK** , and **KELLY** , Circuit Judges.

---

[*]    Mike Mullin replaced Gary Gibson as Warden of the Oklahoma State
Penitentiary effective March 25, 2002.

**BALDOCK** , Circuit Judge.

An Oklahoma jury convicted Petitioner Michael Edward Hooper on three counts of first degree murder in the shooting deaths of his twenty-three-year-old former girlfriend, Cynthia Jarman, and her two children, Tonya Kay Jarman and Timmy Glen Jarman. The jury imposed the death sentence for each count. The Oklahoma Court of Criminal Appeals affirmed Petitioner's convictions and sentences on direct appeal and denied post-conviction relief. See Hooper v. State , 947 P.2d 1090 (Okla. Crim. App. 1997); Hooper v. State , 957 P.2d 120 (Okla. Crim. App.), cert. denied , 524 U.S. 943 (1998). On habeas review, the federal district court granted Petitioner relief from his death sentences after concluding defense counsel's representation during the capital sentencing proceeding was constitutionally ineffective. See 28 U.S.C. § 2254. The court denied relief on numerous other claims in which Petitioner challenged both his convictions and his sentences. Petitioner appealed the district court's denial of habeas relief on his remaining claims. The State cross-appealed the district court's grant of habeas relief from the death sentences. The district court granted a certificate of appealability as to three of Petitioner's claims. This Court granted a COA as to

two additional claims. [2] We have jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 2253. We affirm.

## I.

Petitioner met Cynthia Jarman in early 1992, and they dated through the summer of 1993. Their relationship was physically violent, and Petitioner threatened to kill Jarman on several occasions. In July 1993, Jarman began dating Petitioner's friend, Bill Stremlow. In November, three weeks before the murders, Jarman began living with Stremlow. Before moving in with Stremlow, Jarman confided in a friend that Petitioner had previously threatened to kill her if she ever lived with another man.

On December 6, 1993, Jarman confided in a friend that she wanted to see Petitioner one last time. On the morning of December 7, 1993, Jarman dropped Stremlow off at work and borrowed his truck for the rest of the day. Jarman picked up her daughter, Tonya, at school that afternoon. At that time, Tonya's teacher saw Tonya get into Stremlow's truck next to a white man who was not Stremlow. Jarman failed to pick up Stremlow from work that evening as planned.

---

[2] Because Petitioner filed his appeal after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we address only claims for which a COA has been granted. 28 U.S.C. § 2253(c)(1). A COA is not required for the State or its representative to appeal a district court order granting relief. Fed. R. App. P. 22(b)(3).

Later that night, Stremlow's truck was found burning in a field. The truck's windows were broken out. An accelerant had been used to set the truck on fire.

On December 10, a farmer and police officers discovered the bodies of Jarman and her two children buried in a shallow grave in another field. At the grave site, police found broken glass, tire tracks, a footprint, shell casings, a child's bloody sock, and a pool of blood near a tree with a freshly broken branch. On top of the grave, police found a tree branch in which a nine millimeter bullet was embedded. The bullet pinned white fibers to the branch. The fibers were consistent with the white fibers in Tonya Jarman's jacket. The jacket had a charred hole in the hood. The branch appeared to have been broken off of a tree near the pool of blood. Each victim had suffered two gunshot wounds to the face or head. Although investigators never recovered the bullets, the wounds were consistent with nine millimeter ammunition.

Police arrested Petitioner and searched his parents' home. The police recovered a nine millimeter weapon Petitioner had purchased several months prior to the murders. Police also recovered two shovels with soil consistent with soil from the grave site, two gas cans, and broken glass consistent with glass found in Tonya's coat and near the gate at the field. Police officers also seized Petitioner's tennis shoes. The shoes made prints similar to those found at the murder scene, and DNA tests revealed the presence of blood consistent with

Cynthia Jarman's blood on the shoes. At trial, a ballistics expert testified that shell casings from the crime scene matched casings fired from Petitioner's weapon. Petitioner's former wife testified that Petitioner was familiar with the field where the bodies were found, and that he previously had visited the field with her on several occasions.

Based on this evidence, the jury convicted Petitioner of three counts of first degree murder. During the capital sentencing proceeding, the jury found two aggravating factors existed with respect to all three victims: (1) Petitioner had created a great risk of death to more than one person, and (2) Petitioner was a continuing threat to society. Additionally, the jury found a third aggravating factor existed with respect to Tonya Jarman: Petitioner had committed the murder to avoid arrest or prosecution for the murder of Cynthia Jarman. After considering Petitioner's mitigating evidence, the jury imposed the death sentence for each count.

Petitioner asserts (1) he was denied effective assistance of counsel during sentencing; (2) prosecutorial misconduct prejudiced the jury's deliberations at both the guilt and sentencing stages; (3) his constitutional rights were violated by the State Court's admission of victim impact statements; (4) he was denied effective assistance of counsel during the guilt stage of his trial; and (5) the

accumulation of errors in this case so infected the proceedings with unfairness that he was deprived of a fair and reliable trial and sentencing.

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), if a claim is adjudicated on its merits in state court, a petitioner is entitled to federal habeas relief only if he can establish the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). We presume state court factual findings are correct, and place the burden on the petitioner to rebut that presumption with clear and convincing evidence. Id. § 2254(e)(1). If the state courts did not decide a claim on its merits and the claim is not procedurally barred, we review the district court's legal conclusions de novo and its factual findings for clear error. Hooker v. Mullin, 293 F.3d 1232, 1237 (10th Cir. 2002).

## A.

Petitioner contends his two defense attorneys, Richard Krogh and Mitchell Lee, were constitutionally ineffective in their development and use of psychological evidence during the capital sentencing proceeding. The Oklahoma

Court of Criminal Appeals (OCCA), applying Strickland , found counsels' actions prejudicial, but determined that Petitioner had not demonstrated deficient performance based on the facts contained in the record. OCCA denied Petitioner's request for an evidentiary hearing. On habeas review, the federal district court agreed Petitioner established prejudice and granted an evidentiary hearing limited to the issue of counsel's performance at sentencing. After the evidentiary hearing, the district court found counsel's performance constitutionally deficient, and granted Petitioner relief from his death sentences. The Government cross-appeals this portion of the district court's order.

1.

Prior to the Jarman murders, Petitioner received anger management counseling. In April 1993, after six months of counseling, Russell Adams, Ph.D., gave Petitioner several neuropsychological tests to diagnose possible learning disabilities and to assist Petitioner in making career and educational plans. According to Dr. Adams' report, Petitioner's cognitive functioning was "largely adequate" and his intelligence average, but his difficulty spelling might be evidence of a learning disability. The tests also indicated that Petitioner had some emotional and psychological problems, and that he had difficulty controlling his anger and coping with everyday problems. The report noted that Petitioner's ability to remain controlled in stressful situations was "greatly improved."

In August 1994, defense counsel retained a psychologist, Philip Murphy, Ph.D., to review Dr. Adams' report. Based solely on Dr. Adams' findings, Dr. Murphy prepared a one-page summary report. In his report, Dr. Murphy indicated there was evidence of "mild but probable brain damage" that could increase the likelihood of violence, especially if Petitioner was under the influence of alcohol or other substances. In addition, Dr. Murphy noted Petitioner might suffer from a "serious psychiatric thought disorder." Petitioner had a psychological "profile often . . . associated with psychotic behavior . . . [and] definite difficulties with interpersonal relationships." Dr. Murphy qualified his "impressions" by noting that both "possible disorders require further diagnostic investigation to confirm."

Dr. Murphy sent this report to defense counsel in December 1994. He did not hear from defense counsel again until June 1995, after the jury found Petitioner guilty of murdering Jarman and her two children. That afternoon, trial counsel Lee called Dr. Murphy to request his testimony at the capital sentencing proceeding scheduled for the following day. Dr. Murphy informed counsel he ethically could not testify because he had never personally evaluated Petitioner. He also informed counsel that what he could say about Petitioner likely would be aggravating rather than mitigating. On the phone, defense counsel agreed Dr. Murphy would not testify. But later that day, the defense subpoenaed him to testify the following morning.

During an in camera hearing, counsel explained that they wanted Dr. Murphy to authenticate his report so they could admit into evidence both his report, and the report of Dr. Adams' on which he relied. Defense counsel requested permission to treat Dr. Murphy as a hostile witness in light of the extreme hostility Dr. Murphy directed toward defense counsel and court personnel. Counsel also admitted they were afraid of what Dr. Murphy might say on the witness stand. Defense counsel never spoke with either Dr. Murphy or Dr. Adams about the reports prior to the sentencing phase.

During the capital sentencing proceeding, Dr. Murphy identified both reports and the trial judge admitted each into evidence. Dr. Murphy told jurors he did not put "enormous stock" in his conclusions because he did not personally evaluate Petitioner. He further testified that Dr. Adams, having evaluated Petitioner in person, would be in the best position to address whether Petitioner had brain damage. The State then called Dr. Adams in rebuttal. Contrary to Dr. Murphy's limited assertions, Dr. Adams testified Petitioner had a mild learning disability, but no brain damage. In addition, Dr. Adams asserted that, although Petitioner had some psychological problems, those problems would not cause him to lose touch with reality or make him incapable of controlling himself or his anger. Dr. Adams found "no special problems."

2.

To succeed on an ineffective assistance claim, Petitioner must establish both that his attorneys' representation was deficient and that this deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding." Id. at 696. AEDPA, however, further circumscribes our habeas review. See Bell v. Cone, 122 S. Ct. 1843, 1852 (2002). Because the OCCA applied the correct federal law, Strickland, to deny Petitioner relief on this claim, we consider only whether the OCCA did so in an objectively reasonable manner. See 28 U.S.C. § 2254(d)(1); see also Cone, 122 S. Ct. at 1852.

In denying Petitioner relief, the OCCA first addressed Strickland's prejudice inquiry, finding counsel's use of this psychological evidence prejudiced Petitioner's defense. We agree. Neither Dr. Murphy nor Dr. Adams offered any mitigating evidence and their combined testimony was disastrous for Petitioner's defense. The jury was left with unchallenged expert opinions that Petitioner did not suffer from brain damage, had no particular trouble controlling his temper,

and that his learning disability would not have affected his capacity for violence or ability to reason in adverse circumstances.

The determinative issue in this appeal is whether the OCCA applied Strickland in an objectively reasonable manner in concluding Petitioner did not establish counsels' performance was constitutionally deficient. Although the OCCA determined the testimony of Drs. Murphy and Adams "was disastrous for Petitioner," that counsel's failure to talk to Dr. Adams prior to his trial testimony was "inexplicable" and "overwhelmingly prejudicial," and that Petitioner had raised "serious questions about trial counsel's decisions to call Dr. Murphy and admit the two medical reports," the OCCA found trial counsel's performance was not constitutionally deficient. The court noted that Petitioner had not shown why counsel's reasons for presenting the psychological evidence, or for failing to speak with Dr. Murphy or Dr. Adams regarding the reports, amounted to ineffective assistance. In denying relief, the OCCA also denied Petitioner's request for an evidentiary hearing during which Petitioner could have explored and challenged trial counsel's reasons for the prejudicial acts and omissions.

On habeas review, the federal district court found the OCCA's application of Strickland objectively unreasonable. In light of the record, we agree with the district court. We recognize "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys

would not defend a particular client in the same way." Id. at 689. Accordingly, we consider whether counsels' investigation and presentation of the psychological evidence during Petitioner's capital sentencing proceeding were the result of reasonable trial strategy, rather than the product of "neglectful" or otherwise erroneous representation. Sallahdin v. Gibson, 275 F.3d 1211, 1240 (10th Cir. 2002). In doing so, we review counsel's performance with great deference. We consider all the circumstances, making every effort to "eliminate the distorting effects of hindsight," and to "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. But "the mere incantation of 'strategy' does not insulate attorney behavior from review." Fisher v. Gibson, 282 F.3d 1283, 1296 (10th Cir. 2002). We must consider whether that strategy was objectively reasonable. See id. at 1305; Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000). [3]

---

[3] The dissent suggests that trial counsel's strategy cannot be deemed objectively unreasonable, and thus deficient, unless " no competent counsel would have preceded the way Mr. Hooper's counsel did," citing Cone, 122 S.Ct. at 1854, and Bullock v. Carver, 297 F.3d 1036, 1049 (10th Cir. 2002). Neither Cone nor Bullock stand for the proposition cited by the dissent. Cone reiterates Strickland's strong presumption that counsel's conduct was reasonable, but does not contain any reference to the no-competent-counsel standard. The quoted language appears in Bullock in a parenthetical to an Eleventh Circuit case citation. The no-competent counsel language in Bullock clearly is dicta as Bullock applies the Strickland objectively reasonable standard in reaching its

(continued...)

-12-

Defense counsel's penalty-stage strategy was to present evidence suggesting Petitioner might have brain damage which could have produced violent conduct. Counsel also argued Petitioner's frustration with his mental limitations resulted in a violent eruption culminating in the murder of his former girlfriend and her two children. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland , 466 U.S. at 690. Here, however, defense counsel deliberately pursued this strategy without conducting a thorough investigation.

Mr. Lee testified at the federal evidentiary hearing that he intentionally did not have Dr. Murphy further evaluate Petitioner. Lee claimed he feared the result of such an evaluation would be more harmful than helpful because a more comprehensive examination might establish conclusively that Petitioner did not suffer from brain damage. Lee reasoned that, by relying instead only on Dr. Murphy's report suggesting Petitioner might have brain damage, the defense could still argue that possibility in mitigation. He testified that he thought Dr. Murphy's one-page report "was going to be as good as it was going to get," but

[3](...continued)
holding. AEDPA mandates this court to consider whether the OCCA applied clearly established Supreme Court precedent. Strickland 's objectively reasonable standard is the clearly established Supreme Court precedent for ineffective assistance claims, not the "no-competent-counsel" standard.

-13-

acknowledged that further psychological testing could have provided mitigating evidence .[4]

Defense counsel's strategic decision was not based on a "thorough investigation of law and facts relevant to plausible options." Strickland , 466 U.S. at 690. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. Under the specific facts of this case, counsel's judgment was not objectively reasonable. [5] "A decision not to investigate cannot be deemed reasonable if it is uninformed." Fisher , 282 F.3d at 1296 (citing Strickland , 466 U.S. at 691); see also Battenfield v. Gibson , 236 F.3d 1215, 1229 (10th Cir. 2001) (holding defense counsel's failure to investigate rendered any resulting strategy unreasonable). Although defense counsel feared

---

[4] While not making an explicit credibility finding, the district court questioned lead counsel's testimony about strategy: "Upon reflection of the record in this case, the questions asked by the parties, and the Court's observations of Mr. Lee's demeanor at the evidentiary hearing, the Court is not convinced Mr. Lee's answers on cross-examination regarding his 'tactical decision' to not investigate and pursue further psychological testing were his opinions at the time of Petitioner's trial."

[5] We specifically do not address under what circumstances constitutionally competent counsel must seek psychological evaluation of a capital defendant. In this case, defense counsel specifically chose a defense strategy that required presentation of psychological evidence in mitigation. Having made that strategic decision, counsel's presentation of evidence without further investigation and in an ill-informed and unprepared manner resulted in constitutionally ineffective assistance.

-14-

further investigation might prevent his arguing to the jury that Petitioner might have brain damage, Lee also admitted that he had no idea what additional testing might reveal. Lee was aware of Petitioner's background, including Petitioner's abduction at an early age, previous suicide attempts, and several visits to mental health professionals, which strongly suggested Petitioner had psychological problems. Dr. Murphy's report also suggested Petitioner suffered from psychological problems. The report specifically recommended further diagnostic investigation.

Defense counsel specifically chose to present, as mitigating evidence, the possibility that Petitioner might have brain damage and other psychological problems. Having made that strategic decision, however, Petitioner's counsel then presented this evidence without any further investigation, in an unprepared and ill-informed manner. As a result, defense counsel's examination of Drs. Murphy and Adams was disastrous. Defense counsel never spoke to either Dr. Murphy or Dr. Adams prior to trial and had no idea what these experts would say on the witness stand. See Fisher, 282 F.3d at 1294, 1295 (granting habeas relief where, among other things, trial transcript revealed that "throughout most of [defense counsel's] examination of witnesses . . . he had no idea what answers he would receive to his questions;" as a result, defense counsel's questions "essentially undermined" petitioner's defense). A "decision not to undertake

-15-

substantial pretrial investigation and instead to 'investigate' the case during the trial [i]s not only uninformed, it [i]s patently unreasonable." Fisher, 282 F.3d at 1296.

In addition, although the defense did not intend to call Dr. Adams as a mitigation witness, defense counsel should have foreseen that the State might use him in rebuttal after the defense specifically relied on his report as mitigating evidence. Had counsel not offered this testimony, Dr. Adams report would have remained privileged and inadmissible.

Under the facts of this case, we conclude defense counsel made an objectively unreasonable decision to rely on Dr. Murphy's testimony and Dr. Murphy's and Dr. Adams' reports, without adequately investigating that evidence. [6] Further, defense counsel presented this evidence in an unprepared, uninformed, and disastrous manner. For these reasons, we agree with the federal district court that Petitioner's defense attorneys' performance was objectively unreasonable and, thus, constitutionally deficient. The OCCA's contrary

---

[6] The dissent asserts that defense counsel's decision to present this evidence cannot be deficient because the decision does not "so clearly outweigh[]" the alternative of not presenting the evidence. That would be an appropriate inquiry if counsel were making a fully informed choice between several plausible alternatives. See Cone, 122 S.Ct. at 1853-54. Here, however, Defense counsel made an uninformed strategic choice. The decision to present the evidence was influenced by counsel's inadequate investigation and preparation, rather than by strategic considerations.

conclusion constitutes an objectively unreasonable application of Strickland. We therefore affirm the district court's decision granting Petitioner habeas relief from his death sentences. [7]

## B.

Petitioner also asserts the prosecutor's closing argument, during both the trial's guilt and penalty stages, was improper because (1) the prosecutor misstated the evidence by arguing Tonya escaped and Petitioner chased her down and coldly shot her in the face; (2) the prosecutor impermissibly solicited sympathy for the victims by elaborating on this theory; and (3) the prosecutor's comments, when combined with victim impact testimony, were so egregious that Petitioner is entitled to relief without any further showing of prejudice. [8] Because these challenged remarks do not implicate a specific constitutional right, Petitioner is entitled to habeas relief only if he can establish that the prosecutor's argument,

---

[7] Given our resolution of this claim, we need not address Petitioner's remaining claims challenging counsel's effectiveness at sentencing. See, e.g., Fisher, 282 F.3d at 1289-90.

[8] Although we affirm the district court's order granting Petitioner habeas relief from his death sentences, we address Petitioner's challenges to the prosecutor's remarks made during the capital sentencing proceeding. This issue may arise again during resentencing and, in any event, is intertwined with Petitioner's challenge to the victim-impact evidence, another second-stage claim we also must address. See, e.g., Battenfield, 236 F.3d at 1225, 1235-36 (addressing propriety of prosecutor's second-stage argument, despite granting petitioner habeas relief from his death sentence because his attorney's representation was constitutionally deficient).

-17-

viewed in light of the trial as a whole, resulted in a fundamentally unfair proceeding. See Donnelly v. DeChristoforo, 416 U.S. 637, 643, 645 (1974); Neill v. Gibson, 278 F.3d 1044, 1058 (10th Cir. 2001), cert. denied, 2002 U.S. Lexis 6196 (Oct. 7, 2002).

During the guilt-stage closing argument, the prosecutor argued that when Petitioner shot Cynthia and Timmy Jarman, Tonya Jarman escaped from the truck and fled. The prosecutor asserted that Petitioner chased Tonya, firing a shot that missed the child but pierced her jacket hood, and then catching her, shot her twice in the face and head. The prosecutor also asserted that Tonya "was left to die there in the woods while her blood was spilling onto the ground." Petitioner argues that because no eyewitnesses observed the murders, the prosecutor's argument went beyond the evidence admitted at trial.

The OCCA and the district court held these remarks were reasonable inferences drawn from the record. We agree. The prosecutor presented evidence that police located a pool of blood some distance from the tire tracks and broken glass, and a short distance from the grave. Fibers consistent with Tonya's jacket were found near the pool of blood. DNA experts could not exclude Tonya or Cynthia as the source of the blood. Police found a spent casing matching the bullets in Petitioner's gun near the pool of blood. A branch on top of the grave was embedded with a bullet fired from Petitioner's gun. The embedded bullet had

-18-

pinned fibers consistent with Tonya's jacket into the branch. Tonya's coat had a hole in the hood which appeared to be caused by a hot object going through it. This evidence collectively supported the prosecutor's argument. The prosecutor properly may comment on the circumstances of the crime made known to the jury during trial. See Fowler v. Ward , 200 F.3d 1302, 1312 (10th Cir. 2000), overruled on other grounds by Slack v. McDaniel , 529 U.S. 473 (2000); see also, Clayton v. Gibson , 199 F.3d 1162, 1174 (10th Cir. 1999); Moore v. Gibson , 195 F.3d 1152, 1172 (10th Cir. 1999). The prosecutor also possesses reasonable latitude in drawing inferences from the record. See Duvall v. Reynolds , 139 F.3d 768, 795 (10th Cir. 1998); Moore , 195 F.3d at 1172. The prosecutor's argument was a fair comment on the evidence, and we affirm the district court on this issue.

Petitioner next argues the prosecutor improperly solicited sympathy for the victims. During the second-stage closing argument, the prosecutor argued more dramatically and in more detail that Tonya escaped and Petitioner hunted her down and callously shot her. The prosecutor stated:

> At some point, Tonya managed to get away and flee into the woods. The moment Tonya stepped from that truck and headed for the woods, everyone's worst nightmare came true for her. If you think back, many of us children had the nightmare that I'm referring to, the nightmare of running from something that you cannot get away from. As children, many of us in those dreams in those nightmares were being chased by an evil monster. Tonya Jarman, on that night, had this nightmare become a reality for her. She was being chased through the woods by an evil monster bent on killing her, which he did, this Defendant did. I want you to imagine with me for a moment

-19-

what that little girl went through as she moved from the car and ran through the woods with the Defendant after her. It was obvious from the evidence that she did not get very far before, at some point, she was fired at, and that bullet went whizzing through her coat, through the hood of her coat and into a tree branch. Now, we don't know how long a time passed between the time she was shot and the time she was caught, but it must have seemed like a terribly, terribly, terribly long time. Imagine the horror that Tonya felt when, as she ran from the Defendant, she was caught and turned around and he once again looked that little girl in the face and shot her just below her left eye. After that, he then executes her as well with the second shot and then left that little girl to die alone in the woods with her blood spilling onto the ground.

Petitioner also challenges the prosecutor's statements that "[t]o understand why this Defendant murdered two young, innocent children is to fully realize the depth of his ruthlessness behind his stone cold, evil eyes," and "[s]ome of us may never be able to escape the haunting images of the photographs of Cynthia and Tonya and Timmy, which show what this Defendant did and what he's capable of doing in the future."

The OCCA held that this "expanded . . . argument approaches improper solicitation of sympathy for the victim, but it is based on the evidence presented" and, therefore, did not warrant relief. The district court held OCCA's decision was reasonable. See 28 U.S.C. § 2254(d). We agree. Although the prosecutors remarks were improper, the argument, viewed in light of the trial as a whole, did not result in a fundamentally unfair proceeding. The facts of the crime itself invoke sympathy even absent prosecutorial argument. See Moore, 195 F.3d at

-20-

1172; Duvall, 139 F.3d at 795. The prosecution's theory of the murders was based on substantial evidence. In addition, the court instructed the jury to base its decision only on the evidence received, and not to allow sympathy to affect its deliberations. We presume the jury followed these instructions. See Hale v. Gibson, 227 F.3d 1298, 1325 (10th Cir. 2000).

Finally, Petitioner asserts the prosecutor's comments were so egregious, particularly when considered with the victim-impact evidence, that he should be entitled to relief without requiring any further showing of prejudice. See Brecht v. Abrahamson, 507 U.S. 619, 638 n.9 (1993). Brecht did not "foreclose the possibility that in an unusual case, a deliberate and especially egregious error . . . might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." Id. But, as we stated above, the prosecutor's remarks are largely based on reasonable inferences from the evidence. Any error was not sufficiently egregious to warrant habeas relief.

C.

We next address Petitioner's claim the trial court erred by admitting victim-impact testimony during the capital sentencing proceeding. Pursuant to 22 Okla. Stat. § 984(1), the trial court permitted three members of the victims' families to testify at the capital sentencing proceeding that they believed

Petitioner deserved to die. Although the OCCA concluded the trial court properly admitted this testimony, we agree with Petitioner that the trial court's decision to admit the testimony is contrary to clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d)(1).

The Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." Payne v. Tennessee, 501 U.S. 808, 827 (1991). In so holding, the Court overruled its earlier decisions in Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989). See Payne, 501 U.S. at 811, 817, 830. Nonetheless, we have recognized that "Payne left one significant portion of Booth untouched. . . . [T]he portion of Booth prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in Payne and remains valid.'" Hain, 287 F.3d at 1238-39 (quoting Payne, 501 U.S. at 830 n.2). Therefore, the trial court erred by admitting this victim-impact testimony during Petitioner's capital sentencing proceeding. See id. at 1239. Nonetheless, this constitutional error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (further

-22-

quotation omitted);   see also  Willingham , 296 F.3d at 931 (applying    Brecht 's

harmless-error analysis to similar claim).

Payne  also provides that victim-impact evidence that is "so unduly

prejudicial that it renders the trial fundamentally unfair" deprives a capital

defendant of due process.  501 U.S. at 825.  Because the victim-impact evidence

did not have that effect here, however, the OCCA reasonably denied Petitioner

relief on this due-process claim.      See  Willingham , 296 F.3d at 931;   United States

v. Chanthadara  , 230 F.3d 1237, 1273-74 (10th Cir. 2000).

Finally, because the trial court's constitutional error in admitting this

victim-impact evidence was harmless, and this evidence did not otherwise result

in a fundamentally unfair trial, defense counsel were not constitutionally

ineffective for failing to object to it.  Accordingly, the OCCA also reasonably

denied Petitioner relief on this ineffective-assistance claim.

D.

Petitioner also argues that his defense attorneys abandoned his defense

during the guilt stage and were otherwise ineffective under        Strickland .  Relying

on United States v. Cronic   , 466 U.S. 648 (1984), Petitioner first argues defense

counsel abandoned Petitioner's defense, warranting habeas relief without the need

for him to show any resulting prejudice.  Because the OCCA did not specifically

address this claim, we review it     de novo . See Romano , 278 F.3d at 1150.

-23-

A criminal defendant is deprived of his Sixth Amendment right to effective representation "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, . . . mak[ing] the adversary process itself presumptively unreliable." Cronic, 466 U.S. at 659; Cone, 122 S. Ct. at 1850-51. "[A]n attorney who adopts and acts upon a belief that his client should be convicted 'fail[s] to function in any meaningful sense as the Government's adversary.'" Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir. 1988) (quoting Cronic, 466 U.S. at 666). Nonetheless, prejudice will be presumed under Cronic only "'if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Cone, 122 S. Ct. at 1851 (quoting Cronic, 466 U.S. at 659; emphasis added).

The record does not support the conclusion that defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or that counsel turned on Petitioner or believed he should have been convicted. Defense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments. See Cooks v. Ward, 165 F.3d 1283, 1296 (10th Cir. 1998) (holding counsel's performance did not amount to actual or constructive denial of counsel such that prejudice should be presumed where defense counsel conducted limited cross-examination, made evidentiary

-24-

objections and gave closing argument).  Petitioner's defense attorneys did not "abandon [their] duty of loyalty . . . effectively joining the state in an effort to attain [a] conviction," such that counsel's performance can be deemed per se ineffective.  Davis v. Executive Dir. of Dep't of Corr., 100 F.3d 750, 756-57 & 757 n.3 (10th Cir. 1996) (further quotation omitted).

Petitioner next contends that even if his attorneys did not completely abandon his defense, their guilt-stage representation was still constitutionally ineffective.  To succeed on these claims, Petitioner must establish both that his attorneys' representation was deficient and that the deficiency prejudiced his defense.  See Strickland, 466 U.S. at 687.  To establish prejudice, Petitioner must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  Because the OCCA applied the appropriate standard, Strickland, in denying these claims, AEDPA further circumscribes our review.  See Cone, 122 S. Ct. at 1852.  Under AEDPA, we consider only whether the OCCA applied Strickland in an objecively reasonable manner.  See Cone, 122 S. Ct. at 1852.  Petitioner raises several examples of his counsel's alleged ineffectiveness during the guilt stage.  We examine each in turn.

Petitioner first argues his counsel failed to move to quash his arrest warrant and suppress the evidence seized as a result of that arrest.  Although Stone v.

Powell, 428 U.S. 465 (1976) generally precludes a federal habeas court from reviewing a state court's resolution of a Fourth Amendment challenge to the lawfulness of a search or seizure, we will consider whether defense counsel was ineffective for failing to assert such a Fourth Amendment challenge in the first place. See Kimmelman v. Morrison, 477 U.S. 365, 368, 382-83 (1986). To establish Strickland prejudice on this claim, Petitioner must show both that his Fourth Amendment claim challenging the arrest warrant is meritorious and that a reasonable probability exists that the verdict would have been different absent the excludable evidence. Id. at 375. The OCCA held defense counsel was not constitutionally ineffective for failing to challenge the arrest warrant because the affidavit accompanying the warrant provided enough information to form a substantial basis for probable cause. The district court found this conclusion was objectively reasonable. We agree. The affidavit is a four-page, single-spaced document containing dates of interviews and describing the investigation. The sworn affidavit names all informants. The information contained therein connected Petitioner to the crimes with sufficient particularity to satisfy the probable cause standard. We have little difficulty affirming the district court's denial of relief on this point, particularly because Petitioner fails to identify any reason why the warrant was defective.

-26-

Petitioner next argues his counsel was ineffective for waiving the issue of whether the trial court improperly admitted photographs of the graves. Over defense counsel's objection, the trial court admitted photographs of the victims' bodies at the grave site and further permitted the State to use a slide projector to show the jury these photographs. Later, however, defense counsel concurred in the trial judge's observation, made outside the jury's presence, that he did not observe any "reactions that were out of the ordinary by the jury in looking at these pictures. I don't think they were offended in any way." Defense counsel also noted for the record that the trial court's decision permitting the State to use the slide projector was appropriate.

Petitioner now asserts that defense counsel, with these remarks, was constitutionally ineffective in waiving the previously preserved objections. The OCCA held Petitioner failed to show any prejudice because Petitioner never attempted to challenge these photographs on direct appeal. The district court found this conclusion reasonable, and we concur. Defense counsel's challenged comments did not waive any claim Petitioner later sought to pursue. Nor did the jury hear these comments, which counsel made at sidebar. Thus, Petitioner has failed to demonstrate any prejudice from his counsel's comments.

Petitioner also alleges his counsel ineffectively handled the testing and presentation of DNA evidence. When the police arrested Petitioner, the officers

-27-

noticed what appeared to be blood stains on his left shoe. The State's DNA expert was unable to recover any blood from the left shoe, however, the expert found blood on Petitioner's right shoe that was consistent with Cynthia Jarman's blood and inconsistent with 99.999% of the rest of the Caucasian population.

At the defense attorneys' request, the defense DNA expert tested only Petitioner's left shoe. Unlike the State's DNA expert, the defense expert found blood on the left shoe. The blood was not Petitioner's, but could have been Cynthia Jarman's. In addition, the defense expert found another, unidentified person's blood on that shoe. Because defense counsel asked the defense expert to compare the blood she found on the left shoe only to Petitioner and Cynthia Jarman, the defense expert testified she could not eliminate either Tonya or Timmy Jarman as the source of this other blood.

Petitioner argues his defense expert's testimony failed to support his defense and, instead, bolstered the State's DNA evidence. He also argues defense counsel failed to seek adequate state funds to insure thorough DNA testing, and defense counsel erred in selecting a DNA expert who was underqualified. The OCCA denied Petitioner relief because the defense's presentation of its DNA evidence did not prejudice Petitioner. The district court concluded this determination was reasonable. We agree. The State's expert already established that blood consistent with Cynthia Jarman's blood was on one of Petitioner's

shoes. The defense expert's testimony that Cynthia Jarman's blood also might have been on the other shoe fails to add anything more to the State's case. In addition, a great deal of other evidence linked Petitioner to the killings. Therefore, no reasonable probability exists that the jury would have acquitted Petitioner had the defense expert not testified that blood consistent with Cynthia Jarman's blood was on both Petitioner's left and right shoe. Moreover, Petitioner fails to assert any additional or different DNA evidence that could have been presented in his defense, nor how a more qualified DNA expert would have assisted in his defense.

Petitioner also argues defense counsel was ineffective for failing to question the medical examiner concerning the exact time the victims died. Petitioner contends trial counsel failed to explore the defense that he did not have enough time to commit the murders. Contrary to Petitioner's assertions, defense counsel questioned the medical examiner on this point, and the medical examiner was unable to give a definite answer. Further, Petitioner's counsel did argue that Petitioner did not have time to commit the murders. During trial, counsel elicited testimony from Petitioner's stepfather that he saw Petitioner at home at 3:20 p.m., and that Petitioner returned home around 6:30 p.m. The victims were last seen around 3:45 p.m., and Stremlow's burning truck was discovered around 9:00 p.m. that evening. During guilt stage closing arguments, Petitioner's counsel argued

that Petitioner did not have enough time to kill the victims, move the truck, and walk the seven and a half miles back to his house in three hours. Thus, contrary to Petitioner's assertions, his counsel explored this theory. Simply because the jury did not accept the defense's version of the facts does not mean counsel was ineffective.

Finally, Petitioner asserts defense counsel ineffectively cross-examined State witnesses. Petitioner specifically challenges only counsel's guilt-stage cross-examination of Petitioner's former wife, Stephanie Duncan. The State called Duncan to testify that she and Petitioner had visited the field where the bodies were found on several previous occasions. On cross-examination, however, defense counsel elicited Duncan's testimony that Petitioner had physically abused her during their marriage. This opened the door for the State's inquiry resulting in Duncan's testimony that Petitioner had tried to kill her on several occasions.

Regardless of whether defense counsel's performance was constitutionally deficient in eliciting this testimony, no reasonable probability exists that had jurors not heard Duncan's testimony, they would have acquitted Petitioner. The record already included a great deal of evidence linking Petitioner to the Jarman murders and detailing Petitioner's pattern of violence toward Cynthia Jarman. See Moore v. Marr , 254 F.3d 1235, 1241 (10th Cir.), cert. denied , 122 S. Ct. 670

-30-

(2001). (Defendant was not denied effective assistance of counsel as result of counsel's failure to impeach witness where there was overwhelming evidence against defendant, independent of witness' testimony). Likewise, no reasonable probability exists that the jury would have acquitted Petitioner if defense counsel had impeached Duncan's credibility with evidence that she had been accused of stealing from Petitioner's friend, had been arrested in 1992 for embezzlement, had initiated fights and physically beaten Petitioner during their relationship, and had struck her own mother. We agree with the district court that Petitioner cannot establish the prejudice component of  Strickland  and that the OCCA reasonably denied relief on this claim.

### E.

Finally, Petitioner claims cumulative error warrants habeas relief. Because we affirm the district court's order granting Petitioner relief from his death sentences, however, we consider Petitioner's cumulative-error argument only with respect to the trial's guilt stage.    Although we found the trial errors Petitioner identified individually harmless, the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." Duckett v. Mullin 306 F.3d 982, 992 (10th Cir. 2002) (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir.1990)). "A cumulative-error analysis merely aggregates all the errors that

-31-

individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Id.

The errors Petitioner identified did not, even when accumulated, have a sufficient prejudicial effect to deny Petitioner a fair trial. Extensive evidence supported the jury's finding of guilt. No reasonable probability exists that the jury would have acquitted Petitioner absent the errors. We agree with the district court that Petitioner is not entitled to relief based on cumulative error and that the OCCA reasonably denied relief on this claim.

## III.

In light of defense counsel's constitutionally ineffective handling of the defense's mitigating psychological evidence, we AFFIRM the district court order granting Petitioner relief from his death sentences. We also AFFIRM the district court's denial of any further habeas relief.

01-6238, Michael Edward Hooper v. Mike Mullin.

**KELLY** , Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion, with the exception of the resolution of the claim of ineffective representation during sentencing. I respectfully dissent from this court's holding that the OCCA's determination that Mr. Hooper's counsel did not render deficient performance constitutes an unreasonable application of Strickland v. Washington , 466 U.S. 668 (1984). See 28 U.S.C. § 2254(d)(1). The record fully supports the OCCA's holding on the lack of deficient performance so it cannot be an unreasonable application of Strickland . There are two levels of deference here. First, only if we could conclude that the OCCA's application of Strickland was objectively unreasonable–not merely erroneous, incorrect, or contrary to what we might decide on direct appeal–is habeas relief on this claim warranted. See Bell v. Cone , 122 S. Ct. 1843, 1850 (2002); Williams v. Taylor , 529 U.S. 362, 410-11 (2000). That is becuase "[t]he federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable." Woodford v. Visciotti , 123 S. Ct. 357, 361 (2002) (per curiam). Second, under Strickland , a reviewing court presumes that counsel's decisions were an exercise of reasonable professional judgment and considers all of the circumstances, keeping in mind that the ultimate inquiry is

whether the trial is a "reliable adversarial testing process."     466 U.S. at 688, 688-90.

Applying these standards, counsel made a reasonable strategic choice after less than full investigation given the facts. The trial record suggests scant evidence that Mr. Hooper suffered from brain damage or a learning disability that might have somehow contributed to his calculated and vicious murder of the victim and her two children. Mr. Hooper's counsel subjected the state's case to close scrutiny and the choices made by counsel were, under the circumstances, about as good as could be expected.

Essentially, this court determines that counsel's attempt to get before the sentencing jury evidence of Mr. Hooper's mental limitations, without first determining the likelihood of success after additional investigation, constitutes deficient performance. Dr. Murphy's summary indicating that he "believed Dr. Adams found evidence of 'mild but probable brain damage,'"     was placed before the jury by counsel. Hooper v. State, 947 P.2d 1090, 1114 (Okla. Ct. Crim. App. 1997). Had counsel not placed the substance of the report in evidence (because there was scant evidence to support it), would counsel have been deemed ineffective?

Obviously, Dr. Murphy is a defense-oriented professional expert witness. Was he caught in his own embellishment of Dr. Adams' report? Dr. Adams

-2-

testified on rebuttal that "he found no evidence of brain damage." Hooper, 947 P.2d at 1114. Although the OCCA held that counsel's actions in calling Dr. Murphy and having the two medical reports admitted was "disastrous" and constituted Strickland prejudice, Hooper, 947 P.2d at 1115, it was only so because it was apparent that Mr. Hooper had no mental impairments in any way responsible for the offense. Had counsel's efforts succeeded, or had the state been unable to bring Dr. Adams forward in rebuttal, counsel would have been able to present the jury another argument in support of mitigation.

The decision of the OCCA simply is not an unreasonable application of Strickland because it correctly considered the entire sentencing proceeding and concluded that counsel did present a mitigation case, just not the one Mr. Hooper, with 20-20 hindsight, would have selected. Hooper, 947 P.2d at 1115. The OCCA's conclusion that any deficiencies of counsel on this score simply did not constitute a complete breakdown of the adversarial testing process (and therefore did not constitute deficient performance) is correct. This is not a case where the option contended for (not calling Dr. Murphy and not introducing the medical reports after further investigation) "so clearly outweighs" the course taken by defense counsel as to render the OCCA's decision objectively unreasonable. Bell, 122 S. Ct. at 1854 (on collateral review, a failure to put on mitigating evidence in sentencing phase and waiver of closing was not deficient performance).

-3-

Counsel's effort to raise "mental impairment" was but one of several mitigation attempts, all of which were ultimately unsuccessful. The trial of a case is not a "do it by the numbers" exercise, rather it is uncertain and one uses what one has. Sometimes it works, and sometimes not, but no experienced trial counsel could say that no competent counsel would have proceeded the way Mr. Hooper's counsel did. See id.; Bullock v. Carver, 297 F.3d 1036, 1048-49 (10th Cir. 2002) (applying objective reasonableness standard in Strickland deficient performance analysis and suggesting that to establish deficient performance, habeas petitioner must successfully urge that no competent counsel would have proceeded in the manner that his counsel did). The "'no competent counsel' standard" identified by the court is mere description--no one disputes that the ultimate inquiry in the Strickland deficient performance analysis performed by the OCCA is whether counsel's representation was objectively reasonable. In concluding that "counsel's representation did not fall below an objective standard of reasonableness," Strickland, 466 U.S. at 688, the OCCA's decision is not objectively unreasonable precisely because the OCCA considered the representation as a whole and determined that counsel's representation was within that "wide range" of competence satisfying the Sixth Amendment, i.e. "mak[ing] the adversarial testing process work in the particular case." See Strickland, 466 U.S. at 690; Hooper, 947 P.2d at 1115. As recently articulated by the Supreme

-4-

Court in a similar case reversing a habeas grant by the Ninth Circuit, a state court's determination must be "given the benefit of the doubt" and "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied Strickland incorrectly." Visciotti, 123 S. Ct at 360. Here, the OCCA carefully applied Strickland from start to finish, finding prejudice, but not deficient performance–what we have is a mere disagreement. Accordingly, I would reverse the district court's grant of habeas relief.