**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

RAMON JUILIANO,

        Petitioner - Appellant,

v.

LOUIS E. BRUCE; PHILL KLINE,
Attorney General of Kansas,

        Respondents - Appellees.

No. 05-3107

District of Kansas

(D.C. No. 04-CV-3166-KHV)

ORDER

Before **HARTZ** , Circuit Judge, **SEYMOUR** , Senior Circuit Judge, and
**McCONNELL** , Circuit Judge.

Ramon Juiliano was convicted by a Kansas jury of first-degree murder and

solicitation to commit murder. His conviction was affirmed on direct appeal. *See*

*State v. Juiliano*, 991 P.2d 408 (Kan. 1999).

On March 30, 2002, Mr. Juiliano filed in state court a motion for post-

conviction relief under Kan. Stat. Ann. § 60-1507, claiming that his Sixth

Amendment right to effective assistance of counsel was violated because trial

counsel (1) failed to file a motion to suppress evidence obtained as a result of his

arrest, (2) failed to object to the introduction of evidence of the victim's good

character, and (3) failed to object to certain statements of the prosecutor at trial.

He also asserted (4) that the cumulative errors of trial and appellate counsel denied him the right to effective assistance of counsel. The Kansas district court conducted a hearing and denied the motion. The Kansas Court of Appeals also denied him relief, and the Kansas Supreme Court denied certiorari.

On May 24, 2004, Mr. Juiliano filed an application for federal habeas relief under 28 U.S.C. § 2254. His application asserted essentially the same claims raised in his state motion for post-conviction relief, and also raised three additional ineffective-assistance-of-counsel claims, contending that trial counsel (1) failed to investigate the case thoroughly before trial and failed to interview prosecution witnesses, (2) failed to object to admission of the murder weapon into evidence, and (3) failed to object when the trial judge failed to give an alibi instruction.

The district court held that these latter three claims were procedurally barred. Applying the deferential standard mandated by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, the court denied the other four claims as well. The district court did not act on Mr. Juiliano's request for a certificate of appealability (COA) under 28 U.S.C. § 2253(c). We therefore deem it denied. 10th Cir R. 22.1(C).

Although he raised seven claims below, Mr. Juiliano now seeks from us a COA on only two claims: (1) whether the district court erred in concluding that he

did not exhaust his remedies in state court with respect to his contention that counsel was ineffective for failing to move to suppress the murder weapon; and (2) whether the district court erred in concluding that trial counsel was not ineffective for failing to attempt to suppress evidence obtained as a result of his arrest. We deny a COA and dismiss the appeal.

## I.       FACTUAL BACKGROUND

On February 19th, 1997, at about 11:30 p.m., the Kansas City, Kansas, Police Department dispatch operator notified officers Johnell Daniels and Clinton Swan of a white male jumping in and out of traffic near 84th Street and State Avenue in Kansas City. The officers went to the scene and stopped the man for questioning. He told them that he lived in the area, he and his girlfriend had been in an argument, and he was just walking around to blow off steam. After being asked a few questions, he was allowed to leave. Officers Daniels and Swan then interviewed local residents who informed them that they had seen the man sitting in a parked car beside a business in the area. A registration check revealed that the vehicle was a rental. The officers located the man again to ask him some additional questions. Identification provided by the man revealed that his name was Ramon Juiliano and, contrary to his earlier statements, he did not live in the area. Mr. Juiliano was "evasive" but again indicated that he and his girlfriend were simply having problems. He said that she was cheating on him. When the

officers asked him to identify where she lived, he pointed to some homes. He refused, however, to give them an exact address, again saying that he was just blowing off steam.

Two hours later Officers Daniels and Swan heard over their police radio that a third officer was running a license plate check on the same vehicle, so they again went to the scene. When they arrived, Mr. Juiliano was telling Sergeant Richard Asten about his girlfriend and pointing to a specific well-lit house. He indicated that his long-time girlfriend was there with another man and that he was watching the house. Sergeant Asten told Mr. Juiliano to go home. He noted the address of the house as 1119 North 84th Terrace.

At 11:43 p.m. on May 22, 1997, about three months later, Officer Daniels and two fellow officers were again dispatched to the same location in response to a call from Jack West. West reported that a masked male had jumped out of some woods in the area and pointed a gun at him. The officers investigated, but nothing came of the incident. These were the only times that Officer Daniels, who often patrolled the area, had ever been dispatched to 84th Terrace.

Less than three weeks later, on June 11, 1997, at approximately 11:30 p.m. officers were again dispatched to the area in response to a shooting at 1119 North 84th Terrace, the same home Mr. Juiliano had pointed to on the night of February 19th. Jack West had been shot and lay dead in the doorway of his home

when officers arrived. As soon as Sergeant Asten responded to the shooting and saw the address of the home, he recalled the incidents from February and March and relayed that information to the detectives assigned to the case. Officers Daniels and Swan also reported their contacts with Mr. Juiliano to the detectives.

While at the scene, the investigators learned that Mr. West had been involved in a relationship with a married woman, Michelle Jardon. They were able to locate Mrs. Jardon's parents between 2:00 a.m. and 3:00 a.m. that morning. From them they learned that Mr. Juiliano had also been involved in a relationship with Mrs. Jardon.

The investigators again heard Mr. Juiliano's name that night from an officer who responded to a reported fire on Mr. Juiliano's property shortly after the shooting. Mr. Juiliano had called 911 to report that a van, parked inside a barn on his property, was ablaze. The responding officer, Jay Stewart, noted that although it was not a very warm night, Mr. Juiliano was sweating profusely. He thought the fire looked like an arson, because the van had been reported stolen from Kansas City, Missouri, five days earlier; it had been driven into the barn and parked (the gear shift was in park and the tire tracks revealed no skidding); and the back seats had been removed.

Shortly after leaving the scene of the fire, Officer Stewart stopped at a convenience store where he ran into Officer Chad Cowher, who had just come

from Mr. West's home. Officer Stewart asked Officer Cowher if there were any suspects. Officer Cowher responded that they suspected a guy with the last name of Juiliano. Officer Stewart then related that he had just come from a suspected arson at Mr. Juiliano's home. He then drove to the scene of the shooting and informed the detectives about the suspected arson.

Several officers went to Mr. Juiliano's house at about 4:00 that morning to confront him. It appeared that all the lights were off, except for a television in the front living room. As they approached his door, he came out to the front porch to meet them. He appeared to have been awake. Officers Daniels and Swan identified him as the man they had confronted walking around outside Mr. West's home in February. Detective William Lee Howard patted him down for weapons. Mr. Juiliano became "uncontrollably nervous" and "could not control the trembling of his hands." The officers told Mr. Juiliano that they would like to talk to him about some things, and asked whether he would come to the station with them. They did not mention that they were investigating a homicide. He went back inside to get a shirt and a hat. The officers conducted a sweep of the home during which they observed ammunition and numerous weapons inside the house. Mr. Juiliano was then taken to the police station for questioning. He was not handcuffed. He waived his *Miranda* rights, was

questioned about the arson and the murder, and signed a consent form for the search of his home and property.

Officers returned to Mr. Juiliano's home at about 8:00 a.m. to conduct a search. A fence surrounded the 20-acre property. The house was searched first. Officers seized several guns, mostly rifles; ammunition, including some spent .357 shell casings; a shoulder holster; gun cases; and love letters and cards between Mr. Juiliano and Mrs. Jardon, which were sitting out in the living room. The officers then searched the barn. The murder weapon was not discovered during this search.

On June 16 officers returned to Mr. Juiliano's home with a warrant to search the property again. During this search, with the use of dogs, the officers were able to recover what was later determined to be the murder weapon, a six-inch .357 Smith & Wesson Magnum. They also searched the home again and found more evidence of Mr. Juiliano's "possessiveness" with respect to Mrs. Jardon, including more love letters, saved phone messages, and a diary consisting of entries solely about Mrs. Jardon. And they recovered from a Blazer parked at the residence a scanner tuned to the Kansas City Police Department frequency, a pair of binoculars, some yellow work gloves, and Mr. Juiliano's wallet.

## II.    DISCUSSION

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This means that the applicant must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). In other words, the applicant must show that the district court's resolution of the constitutional claims was "debatable or wrong." *Id*. If the petition was denied on procedural grounds, the applicant faces a double hurdle. Not only must the applicant make a substantial showing of the denial of a constitutional right, but he must also show "that jurists of reason would find it debatable whether the . . . district court was correct in its procedural ruling." *Id*. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further." *Id*.

AEDPA provides that when a claim has been adjudicated on the merits in state court, a federal court will grant habeas relief only when the applicant establishes that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

> Under the "contrary to" clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, relief is provided only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. Thus we may not issue a habeas writ simply because we conclude in our independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (internal quotation marks, brackets, and citations omitted).

## A.    Failure to Move to Suppress Murder Weapon

Mr. Juiliano argues that his Sixth Amendment right to effective assistance of counsel was violated by the failure of his trial counsel to move to suppress the murder weapon. The district court ruled that this claim was not exhausted in state court. State prisoners generally may not raise a claim for federal habeas corpus relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Mr. Juiliano contends that the district court erred. We agree with the district court.

The heading for this claim in Mr. Juiliano's § 2254 application states:

"Petitioners defense counsel was ineffective for failing to object to and attempt to suppress the admission into evidence of the murder weapon which was found four and one half (4½) days after the murder, on the ground on the petitioners property." Petition for Writ of Habeas Corpus at 11-3. The supporting argument, in full, is:

> The mere fact that the murder weapon was found almost 4½ days after the murder brings to light several avenues of defense. Was the weapon found even the murder weapon? Was the weapon that was found Mr. Juiliano's property? Did he place it on the ground on his property? Was the proper chain of evidence maintained after the weapon was found? And most important [sic], why did defense counsel fail to attempt to raise such issues at trial and why did appellate counsel fail in the same respect?

> Petitioners [sic] defense counsel failed to object in any manner to the admission of the weapon into evidence thereby failing to preserve the issue for appeal. Said weapon is a major piece of evidence in the trial of the petitioner, in fact, it is the only piece of physical evidence and it does not directly connect the petitioner to the crime. There is no other physical evidence in this case. The failure of defense counsel to make a timely objection or motion for supression [sic] as to the admission of this evidence is unreasonable and could not possibly relate to any type of trial strategy and is in fact a blatant example of ineffective assistance of trial counsel and mandates reversal of the petitioners [sic] conviction and an order for a new trial by this court.

*Id*.

Mr. Juiliano's application asserts that this argument was raised in his state-court direct appeal. The district court correctly disagreed. Mr. Juiliano now

-10-

responds that the issue was raised in his post-conviction motion for relief in state court. But the claim he points to there relates to the legality of his arrest. We agree with the district court that this claim was not properly exhausted in state court (except insofar as it raises the Fourth Amendment argument encompassed by his other claim before us). We also agree that the claim could not now be raised in state court and is therefore defaulted. Although Kansas does not absolutely prohibit second or successive petitions for post-conviction relief, *see* Kan. Stat. Ann. § 60-1507(c), any petition for post-conviction relief

> must be brought within one year of: (1) The final order of the last appellate court in [Kansas] to exercise jurisdiction on a direct appeal or the termination of such appellate jurisdiction; or (ii) the denial of a petition for writ of certiorari to the United States supreme court or issuance of such court's final order following granting such petition.

*Id*. 60-1507(f). This statute of limitations became effective on July 1, 2003. *See Hays v. Kansas*, 115 P.3d 162, 165 (Kan. App. 2005). Mr. Juiliano "had 1 year from the effective date of the 2003 amendment to file his 60-1507 motion." *Id*. A return to Kansas courts now would be futile. The claim is therefore defaulted and the district court did not err in refusing to address the merits. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B. Failure to Challenge Legality of Arrest

Mr. Juiliano asserts that he was arrested without probable cause in the early morning hours of June 12, 1997, for the murder of Mr. West, and that the

-11-

unlawful arrest tainted his consent to a search of his property, which in turn tainted a warrant issued four days later for a second search of his property. He contends that he was denied his Sixth Amendment right to effective assistance of counsel because of his trial counsel's failure to move for suppression of the evidence, including the murder weapon, on this basis.

"To succeed on an ineffective assistance claim, Petitioner must establish both that his attorneys' representation was deficient and that this deficient performance prejudiced his defense." *Hooper v. Mullin*, 314 F.3d 1162, 1168-69 (10th Cir. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Mr. Juiliano fails with respect to both prongs of the *Strickland* requirement.

First, the state court ruled that Mr. Juiliano failed to establish prejudice. Because the state court addressed this issue on the merits, Mr. Juiliano can prevail only if that ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). At the hearing on Mr. Juiliano's state post-conviction motion for relief, the trial court found that he had not established *Strickland* prejudice because there was probable cause to support the arrest:

I remember this case pretty clearly. I've gone over my trial notes and my own recollections of testimony, evidence and the actions of the parties involved. . . .

. . . .

. . . . There's absolutely nothing in the trial record, in my notes, recollections that would indicate that the defendant received anything short of first rate criminal defense by a first rate criminal defense attorney, some who—someone who specialized in that area.

. . . . I believe the evidence clearly shows [that the arrest was lawful.] [N]o stretch of the imagination—no stretch of the imagination, no looking at the facts in this case would indicate to any experienced jurist that the arrest was nothing short of legal. There's more—more than adequate and ample probable cause to effectuate the defendant's arrest in the Court's opinion based upon the evidence.

R. Vol. XV at 34-36.

This determination was not contrary to or an unreasonable application of clearly established Supreme Court precedent. Before the officers arrested Mr. Juiliano, they knew that (1) he had been stopped by police twice on the same night while surveying Mr. West's home, where he believed his girlfriend was cheating on him; (2) Mr. West had been confronted in the same location by a masked man pointing a gun at him; (3) Mr. Juiliano and Mr. West had a relationship with the same woman; and (4) shortly after the shooting a suspected arson of a stolen van occurred on Mr. Juiliano's property. In addition, when Officer Stewart responded to the arson, he observed that Mr. Juiliano was sweating profusely, although it was a cool night. And when police arrived to confront Mr. Juiliano, he appeared to have been awake and was nervous and

shaking uncontrollably. Based on this information, the state court could reasonably decide that a reasonable officer could have concluded that Mr. Juiliano had committed arson, murder, or both.

Second, Mr. Juiliano has failed to show that his attorney's representation was deficient. Certainly, competent counsel need not raise a motion to suppress that seems unlikely to succeed, as was the case here. Moreover, challenging the legality of the arrest would have been inconsistent with the trial strategy of showing that he fully cooperated with the police officers.

At trial Mr. Juiliano testified: "When they were at my house they just said they had some questions they wanted me to answer and if I'd go downtown with them and talk to them. I said, 'Sure.'" R. Vol. XII at 1595. He was not handcuffed. He was taken to the police station, where he waived his *Miranda* rights and signed a consent form for the search of his home and property. In cross-examining Detective Roger Golubski, one of the officers involved in the interrogation, Mr. Juiliano's lawyer focused on how cooperative his client was:

> Q  And did he have handcuffs on?
> A  No.
> Q  I bet you read him his rights?
> A  As soon as he stated that he knew the other two people involved, yes, we did.
> Q  All right. And you indicated to him that he didn't have to talk to you, correct?
> A  That's correct.
> Q  That he could—if he started to talk to you, he could stop at any time?

-14-

A   That's correct.

Q   That if he wanted a lawyer, he could have one there, right?

A   Yes, sir.

Q   If he couldn't afford a lawyer and wanted one, you would find somebody before he started to talk, correct?

A   Yes, sir.

Q   You would have even allowed him to have called an attorney if he knew one, right?

A   Yes, sir.

Q   And he did not invoke those rights, did he?

A   No, sir.

Q   He waived those rights to talk to you and to have an attorney present?

A   Correct.

Q   Even signed that document, right?

A   Yes sir.

. . . .

Q   When he was talking to you in this statement, did he also consent during that period of time to give you the opportunity to go look and search, rummage through his home?

A   Yes, sir.

Q   And he said, and here are the keys to my home or this is where you'll find the keys to my home, correct?

A   Yes, sir.

Q   He didn't in any way prevent you from going back on his property to conduct a thorough investigation concerning allegations made or at least thought of about him, isn't that correct?

A   Yes, sir.

R. Vol. X at 1102-04. Similarly, in cross-examining Detective Pat Greeno,

Mr. Juiliano's attorney asked:

Q   When you went to Mr. Juiliano's house, you waited until there was a key to get in, correct?

A   Yes.

-15-

Q     Because it's your information that Detective Howard had
       my client—asked my client if it was okay to search his
       house, right?
A     Yes.
Q     And so my client at least according to your knowledge
       gave consent, probably even wrote on a consent form?
A     Correct.
Q     And even gave them the key, correct?
A     Yes.

R. Vol. IX at 939. Mr. Juiliano's attorney returned to this theme in his closing

statement:

> My client took the witness stand and he indicated to you under
> oath, under cross-examination that he didn't do this. And you can
> say that the everyday guilty people confess and guilty people give
> consent. My client said, you want to go out to my house. I don't
> need a lawyer. You want to look inside my house. You want to look
> at my property. What did Detective Howard say? We got a consent
> for his—his house and the 20 acres. If my client put a pistol out
> there, he's given them consent to go look and if he is so
> knowledgeable because he has this police scanner, he knows all of
> these things.
>
> He knows they're going to look everywhere. They think he's
> involved in this homicide. They're looking for a weapon. They're
> going to tramp everything down. They're going to go look in the
> ponds. And he said, go ahead. I got nothing to hide. Go look.

R. Vol. XII at 1722-23. In addition, Mr. Juiliano testified that he had pleaded

guilty to charges of arson and theft relating to the van that was set afire in his

barn.

This focus on Mr. Juiliano's cooperativeness would have been inconsistent

with a claim that he had been taken to the police department on the night of the

murder while under the compulsion of arrest (much less under *false* arrest). Of course, he could have argued in a pretrial motion that he had been subjected to an unlawful arrest, but he could not have testified at a suppression hearing without providing testimony that could have been used to impeach him at trial. In this circumstance, we cannot say that his counsel was deficient in failing to move to suppress evidence based on an unlawful arrest.

## III. CONCLUSION

We DENY a COA and DISMISS the appeal.

ENTERED FOR THE COURT

HARRIS L. HARTZ
Circuit Judge