FILED
United States Court of Appeals
Tenth Circuit

October 16, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROCKY EUGENE DODD,

        Petitioner - Appellant,

    v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,[*]

        Respondent - Appellee.

No. 11-6225

**ORDER**

Before **BRISCOE**, Chief Judge, **KELLY** and **HARTZ**, Circuit Judges.

This matter is before us on Respondent-Appellee's Petition for Rehearing En Banc. Upon initial consideration, the judges assigned to hear this appeal originally reviewed the petition as an implicit request for panel rehearing. Upon that review, we GRANT the petition solely for the limited purpose of making a revision to page 39 of our opinion. The original opinion filed on September 16, 2013, is therefore vacated, and the attached revised opinion is substituted in its place. The Clerk is directed to issue the new decision nunc pro tunc to the original filing date. Panel rehearing is otherwise denied.

---

[*] Pursuant to Fed. R. App. 43(c)(2), Anita Trammell, who was appointed Warden of the Oklahoma State Penitentiary on February 28, 2013, is automatically substituted for Randall G. Workman as Respondent in this case.

In addition, the en banc petition was also circulated to all of the judges of the court who are in regular active service. As no judge on the panel nor on the en banc court as a whole requested a poll, the petition for en banc rehearing is denied.

Entered for the Court,

ELISABETH A. SHUMAKER
Clerk of Court

FILED
United States Court of Appeals
Tenth Circuit

September 16, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

ROCKY EUGENE DODD,

      Petitioner - Appellant,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,[**]

      Respondent - Appellee.

No. 11-6225

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:06-CV-00140-D)**

Randy A. Bauman, Assistant Federal Public Defender, Western District of Oklahoma, Oklahoma City, Oklahoma, (Samuel J. Glover, Village, Oklahoma, with him on the briefs), for Petitioner - Appellant.

Seth S. Branham, Assistant Attorney General, (E. Scott Pruitt, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.

Before **BRISCOE**, Chief Judge, **KELLY** and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

---

[**] Pursuant to Fed. R. App. 43(c)(2), Anita Trammell, who was appointed Warden of the Oklahoma State Penitentiary on February 28, 2013, is automatically substituted for Randall G. Workman as Respondent in this case.

Defendant Rocky Eugene Dodd was convicted on two counts of first-degree murder in Oklahoma state court and received two death sentences. The two victims were his next-door neighbors in an apartment complex in Edmond, Oklahoma. They were found in their apartment with their throats cut. The prosecution case was circumstantial; there were no eyewitnesses, no confession, and no fingerprint, blood, or DNA evidence linking Defendant to the killings.

Defendant applied for relief from his convictions and sentences under 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. All 15 claims in his application were denied. He appeals the denial of four claims: (1) that the evidence of guilt was insufficient to sustain his convictions; (2) that the trial court denied him the rights to present a complete defense and confront witnesses when it excluded evidence that somebody else had committed the murders; (3) that prosecutorial misconduct denied him a fair trial; and (4) that testimony by the victims' relatives recommending the death penalty violated the Eighth Amendment's ban on cruel and unusual punishment. We affirm the denial of relief on the first three claims. But we reverse on the fourth. Accordingly, we remand the case to the district court with instructions to grant relief on Defendant's sentences, subject to the State's right to resentence him within a reasonable time. We deny Defendant's request for a certificate of appealability on three additional claims.

# I. BACKGROUND

After his first convictions were set aside on appeal, Defendant was retried, convicted, and sentenced to death in Oklahoma state court for the 1994 murders of Keri Sloniker and Shane McInturff. *See Dodd v. State*, 100 P.3d 1017, 1024 (Okla. Crim. App. 2004). The opinion of the Oklahoma Court of Criminal Appeals (OCCA) affirming the convictions and sentences described most of the key facts surrounding the murders and second trial:

> On the afternoon of Monday, November 7, 1994, the bodies of Shane McInturff and his fiancé[e], Keri Sloniker, were found lying side by side, face-down in a pool of blood, in the bedroom of their Edmond apartment. [Defendant] lived in an apartment immediately next door to the victims with his wife, Shelly Dodd, and their infant daughter. [Defendant] and Shane McInturff were also co-workers at a local business. The bodies were found by Shane's father, Robert McInturff, after [Defendant] reported that Shane had not shown up for work that day. [Defendant] accompanied Robert McInturff as he gained entry into the apartment. Upon seeing the bodies, Robert McInturff called for help; emergency personnel and police arrived within minutes.

> Detectives began processing the scene and interviewing witnesses. McInturff and Sloniker had not been seen by anyone since the early morning hours of Sunday, November 6, 1994. They had spent much of Saturday in the company of two friends, Brian Brown and Lisa Way. Brown testified that while at the victims' apartment on Saturday afternoon, he saw [Defendant] come over and hand McInturff a check for $70.00. McInturff later showed Brown another $70.00 check that [Defendant] had given him earlier in the day. Brown stated that the checks were payments for methamphetamine that McInturff had supplied to [Defendant].

> Later that evening, Brown, Lisa Way, and the two victims went to a local pool hall after smoking marijuana and methamphetamine at the victims' apartment. Lisa Way testified that the victims kept a

stash of drugs in a box under their living room couch, and that the box was under the couch when the foursome left to play pool. They arrived at the pool hall at approximately 10:30 p.m. and left at approximately 1:30 a.m. Brown dropped off the rest of the group at the victims' apartment and went home; the victims invited Way to come up and watch a movie and spend the night at their apartment, and Way accepted. Upon entering the apartment, McInturff asked Keri to roll a joint. According to Way's testimony, when Keri pulled the box from under the couch, she saw that the cache of drugs was missing. McInturff became extremely angry and loud, kicking the common wall between his and [Defendant's] apartment, and loudly accusing [Defendant] of stealing the drugs. McInturff then went next door to [Defendant's] apartment, where a heated exchange took place. Soon after McInturff returned to his apartment, [Defendant] followed and told McInturff to keep the noise down because his child was trying to sleep.

Part of the confrontation between [Defendant] and McInturff was also witnessed by Dennis Kersh, who lived in an apartment across the breezeway of the small complex. At approximately 2:00 a.m. Sunday morning, Kersh was awakened by a loud noise outside. He then heard someone yell "fuck" from the direction of the victims' apartment. From his window, Kersh saw [Defendant] run over to the victims' apartment. According to Kersh, as [Defendant] entered the apartment he yelled, "what the fuck is going on."

According to Lisa Way, after [Defendant] left the apartment, the victims began discussing a plan to cash the two checks [Defendant] had given McInturff earlier that day, and tell [Defendant's] wife that he was still using drugs. They believed this would cause problems for [Defendant], because [Defendant's] wife (who happened to be out of town at the time) had threatened to leave [Defendant] if she ever found out he was using drugs again. Way decided not to stay the night after all, and left the victims' apartment at about 3:00 a.m. on Sunday. This was the last time anyone saw Shane McInturff and Keri Sloniker alive. Later that Sunday, Brown found McInturff's paycheck in his car. At approximately 5:00 p.m., Brown went by the victims' apartment to return the paycheck, but no one answered when he knocked on the door. [Defendant], who was sitting outside his apartment, told Brown he had not seen Shane or Keri that day.

-4-

[Defendant] told police that on the morning of Monday, November 7th, he went by the victims' apartment to give McInturff a ride to work. No one responded to his knocks, and McInturff did not report to work that day. Because the victims did not have a telephone, [Defendant] left several messages throughout the day on the answering machine of Shane McInturff's parents, expressing concern about Shane and Keri's whereabouts. [Defendant] was off work and at the apartment complex later that afternoon when Robert McInturff arrived to check on his son. The front door was locked, and Mr. McInturff first tried to enter the apartment through a front window, which the victims were known to routinely leave unlocked; however, the window was locked as well, so he obtained a key to the apartment from the landlord.

Upon entering the apartment, Mr. McInturff observed two bodies face-down on the bedroom floor. Mr. McInturff testified that he did not turn on the bedroom light and that [Defendant] remained near the front door. McInturff yelled for [Defendant] to call 911. Because of the location and position of the bodies, Mr. McInturff stated that he was unable to determine the manner in which Shane and Keri were killed. He noticed that Shane's wallet was lying open in the living room.

The earliest that any of the emergency personnel or police were able to tell the manner in which the victims had been killed was approximately 9:25 p.m. Monday evening, several hours after the discovery, when the bodies were moved for the first time by the medical examiner, who determined that the victims had their throats cut with a very sharp bladed instrument. Before that, the assumption had been that the victims were shot in the head. [Defendant] was being questioned at the police station at the time the true cause of death was revealed. In a key piece of evidence, [Defendant] spoke with Dale Ketler, his supervisor at work, at 6:41 p.m. on Monday evening—a half-hour after the bodies had been found—and informed him that Shane and Keri had been murdered and that their throats had been cut. In another key piece of evidence, at work earlier that day, [Defendant] returned a large, fixed-blade hunting knife that he had borrowed from a co-worker, Al Ames. He left the knife at Ames' workstation, with a note of thanks for getting to borrow the knife and adding that he never had a chance to use it. When news of the

murders spread around the workplace on Tuesday, Ames turned the knife and the note over to police.

Investigation of the crime scene revealed trace evidence that someone may have washed blood down the victims' bathroom sink. A missing hand towel from that bathroom was found in the apartment complex dumpster, stained with blood. DNA analysis could not exclude either victim as the source of that blood. Except for the fact that Keri's purse had been dumped out, the victims' apartment was intact, with nothing of known value taken; Keri's engagement ring was still on her finger. No sign of a weapon was found, and although the victims were positioned as if they might have been bound by the wrists, no ligatures or ligature marks were discovered. No traces of blood were found on the knife [Defendant] had borrowed from Al Ames. There was no sign of a struggle with the victims or any defensive wounds on their bodies. There was no sign of forced entry, and Robert McInturff had found the front door to the apartment locked. Police found the front window to the apartment unlocked, even though Robert McInturff stated that he had unsuccessfully tried to open that window when he, accompanied by [Defendant], first tried to gain access to the apartment late Monday afternoon.

[Defendant], Brown, and Way were all questioned by police the night the bodies were discovered. When questioned about the two $70.00 checks that Brown had seen in McInturff's possession, [Defendant] first claimed he had loaned McInturff money to buy a car from McInturff's uncle, and that McInturff actually returned the checks later Saturday afternoon because the uncle was selling the car to someone else. [Defendant] claimed that he tore the checks into several pieces and tossed them in the trash. [Defendant] was apparently unaware that Lisa Way had returned to the victims' apartment early Sunday morning after playing pool, and had seen the two checks at that time. He was also unaware that before she was murdered, Keri Sloniker had entered the two checks into her check register and filled out a deposit slip for them. A search of the apartment complex dumpster revealed trash from [Defendant's] apartment, but no evidence of the checks. Robert McInturff cast further doubt on [Defendant's] initial claim when he testified that he had made arrangements to loan Shane money to buy a car from his brother in Arkansas.

At trial, [Defendant] testified on his own behalf and modified his version of events. First, he admitted that the two $70.00 checks he had written to McInturff were payment for methamphetamine, and not a car loan as he initially claimed. He claimed that when McInturff's father opened the apartment late Monday afternoon, he ([Defendant]) saw the checks by McInturff's wallet and took them then. To explain the fact that no evidence of the checks had been found in the dumpster, [Defendant] again altered his version of events, claiming that he had run back to his own apartment, nauseated upon finding his friends were dead and, while vomiting in the toilet, tore up the checks and tossed them in as well.

At trial, [Defendant] admitted that he had borrowed a hunting knife from his co-worker, Al Ames, a few weeks before the murders, and returned it the day the bodies were discovered. However, [Defendant] claimed he did not have access to the knife at the time of the murders, because his wife had traveled out of town for the weekend, and he had placed the knife in the trunk of their car on Friday before she left. In rebuttal, [Defendant's] wife, Shelly Dodd, testified she was in and out of the car trunk several times that weekend, and that she did not recall seeing Ames's knife therein.

[Defendant] also offered a new explanation at trial for why he told Dale Ketler that the victims had their throats cut, even though the cause of death was not determined until several hours later. [Defendant] originally told police that he just assumed a knife had been used because of all the blood surrounding the bodies. At trial, however, [Defendant] claimed for the first time that he had observed the emergency responders talking with each other at the scene, and saw one of them make a gesture across his throat with his thumb. In rebuttal, the State presented the testimony of the first responding emergency personnel. None of them recalled making any such gesture, and all testified that such a gesture would be highly unprofessional conduct at a homicide scene. One of the first emergency responders also testified that when he first came on the scene and spoke with [Defendant], [Defendant] claimed that he had been playing pool with the victims the previous Saturday night.

During a search of [Defendant's] apartment on Monday evening, police seized a number of items, including a pair of wet blue jeans and a copy of the "Anarchist Cookbook," which Brian

-7-

Brown had lent to [Defendant] and which describes, among other things, how to kill a person efficiently with a knife by cutting their throat. In his testimony, [Defendant] could give no explanation for the wet jeans. Martin Mullins, [Defendant's] father-in-law, testified that [Defendant] had done laundry at his home on the afternoon of Saturday, November 5; [Defendant's] apartment did not have a washer or dryer. Mullins did not recall [Defendant] returning to his apartment with any wet clothing that afternoon, which was two full days before the wet jeans were seized. Shelly Dodd testified that she did not hand-wash any jeans after she returned from her weekend trip on Sunday evening.

According to Mullins, while [Defendant's] laundry was washing and drying, on Saturday afternoon, [Defendant] spent his time shooting a crossbow pistol in Mullins' backyard and sharpening several hunting knives that Defendant had brought over with him. Mullins recalled that [Defendant] had brought a folding-blade knife and a fixed-blade knife to his home for sharpening. The knife [Defendant] had borrowed from Ames was a fixed-blade knife, and detectives found it to be very sharp when they obtained it. According to police, the only fixed-blade knife found in [Defendant's] apartment had a dull blade, suggesting that he did not, in fact, sharpen that knife at Mullins' home on the Saturday before the murders. At trial, [Defendant] claimed he only sharpened two folding-blade knives at Mullins' home.

Mullins also testified that after [Defendant] was arrested and charged with the murders, he helped his daughter move out of the apartment. While packing, Mullins said, he found several magazines devoted to photos and articles about how to kill people, including one that, according to Mullins, had a cover story about "How to cut your target's throat and leave no evidence." Shelly Dodd's cousin, Malinda Anderson, testified that she had seen similar magazines in [Defendant's] bedroom in mid–1993, when she and her husband spent the night there.

As noted, [Defendant] testified on his own behalf at trial, and denied any participation in the murders. He also presented expert testimony suggesting that it would have been unlikely that one person could have subdued two victims without having to restrain either of them with some sort of binding.

-8-

*Id.* at 1024–27 (paragraph numbers omitted).

After the jury returned a guilty verdict on each of the two first-degree murder counts, the trial moved to the sentencing phase. For each count the jury found two statutory aggravating factors beyond a reasonable doubt: (1) that Defendant had previously been convicted of a violent felony, an armed robbery committed at age 16, *see id.* at 1024, 1047; and (2) that he had knowingly created a great risk of death to more than one person, *see id.* at 1024, 1047–48. The jury fixed Defendant's punishment at death for each count, and the court imposed two death sentences. *See id.* at 1024.

Defendant appealed directly to the OCCA, which denied relief. *See id.* at 1052. He then filed two applications for postconviction relief in state court, both of which the OCCA denied.

In October 2006 Defendant filed his application for relief under 28 U.S.C. § 2254. He asserted 15 grounds for relief, seven of which are relevant to this appeal:[1] (1) that the evidence of his guilt was insufficient to sustain a conviction

---

[1] Defendant also raised the following eight claims not presented in this appeal: (1) that he was denied his right to be present at all critical stages of the proceedings; (2) that judicial bias violated his right to a fair and impartial tribunal; (3) that the trial court inadequately instructed the jury on the option of sentencing him to life without possibility of parole; (4) that the court failed to instruct the jurors that before they could impose the death penalty, they must find unanimously that one or more of the aggravating factors outweighed any mitigating factors beyond a reasonable doubt; (5) that the aggravating factor for a prior violent-felony conviction was unconstitutional as applied to him because he

(continued...)

on either murder count; (2) that he was denied his constitutional rights to present a complete defense and to confront witnesses against him when the trial court refused to admit evidence that someone else had committed the crimes; (3) that prosecutorial misconduct deprived him of a fair trial at both the guilt phase and the sentencing phase; (4) that improper victim-impact testimony at the sentencing phase violated his rights under the Eighth Amendment; (5) that the admission of hearsay and bad-acts evidence at the guilt phase violated the Confrontation Clause and his right to a fair trial; (6) that his trial counsel was ineffective; and (7) cumulative error. He also requested discovery and an evidentiary hearing.

The district court denied Defendant's requests for discovery and an evidentiary hearing, and denied relief on all claims. But it granted a certificate of appealability (COA) with respect to claim (1), insufficiency of the evidence, and claim (4), improper victim-impact testimony. *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a COA to appeal the denial of a § 2254 application). Defendant timely filed a notice of appeal. We expanded the COA to cover claim (2), exclusion of evidence of a third-party culprit, and claim (3), prosecutorial misconduct. Defendant appeals the denial of relief on claims (1) through (4) and requests a

---

[1](...continued)
had committed the underlying offense before turning 18; (6) that certain forensic testimony regarding Al Ames's knife and the crime scene was unreliable and misleading; (7) that the trial court improperly admitted evidence of his suicide attempt while awaiting trial in prison, mishandled a note from the jury, and denied the jury a helpful view of the crime scene; and (8) that his appellate counsel was ineffective.

COA on claims (5) through (7): improper hearsay and bad-acts evidence, ineffective assistance of trial counsel, and cumulative error.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must apply a "highly deferential standard" in § 2254 proceedings, one that "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks omitted). If a claim has been "adjudicated on the merits in State court proceedings," we may not grant relief under § 2254 unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision," *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under the "contrary to" clause of § 2254(d)(1), we may grant relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Id.* at 413. And

-11-

under the "unreasonable application" clause, we may grant relief only "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A]n unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (emphasis, citation and internal quotation marks omitted). In evaluating whether the application of a rule was unreasonable, we must consider the rule's specificity. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*

Finally, "[w]hen a federal claim has been presented to a state court and the state court has denied relief," we may "presume[] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011). "Where . . . there is no indication suggesting that the state court did not reach the merits of a claim, we have held that a state court reaches a decision 'on the merits' even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion." *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (emphasis omitted).

-12-

## III.  ISSUES ON WHICH DEFENDANT HAS OBTAINED A COA

### A.    Sufficiency of the Evidence

Defendant claims that the evidence against him was insufficient to sustain his convictions.  Evidence is sufficient to support a criminal conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On direct appeal the OCCA rejected Defendant's claim on the merits.  *See Dodd*, 100 P.3d at 1041–43.  It concluded:  "Reviewing the evidence as a whole, including the evidence presented by the defense, we believe a rational juror could have determined that [Defendant's] guilt was the only reasonable hypothesis presented, and further, that the hypothesis was proven beyond a reasonable doubt." *Id.* at 1042–43.

Given the OCCA's merits adjudication of this claim, "our task is limited by AEDPA to inquiring whether the OCCA's application of *Jackson* was unreasonable." *Matthews v. Workman*, 577 F.3d 1175, 1183 (10th Cir. 2009).  It was not.  The OCCA reasonably held that the evidence could have permitted a rational trier of fact to find Defendant guilty on both counts of first-degree murder beyond a reasonable doubt.  We deny relief on this claim.

### B.    Exclusion of Evidence of a Third-Party Culprit

-13-

Defendant claims that he was denied his constitutional right to present a complete defense when the trial court excluded evidence that somebody else had committed the murders. The OCCA rejected this claim on the merits. *See Dodd*, 100 P.3d at 1032–34. We cannot say that this decision was contrary to or an unreasonable application of law clearly established by the Supreme Court.[2]

### 1. Background

Before trial, Defendant filed a notice of intent to present evidence that a person other than the accused had committed the murders. The motion listed more than a dozen items of potential evidence; but we recite only the items that Defendant emphasizes in this appeal. Robert McInturff, father of victim Shane McInturff, made a statement to the police on November 7, 1994, the day the bodies were discovered. In it he recounted Shane's telling him the prior June that Shane had run up a debt with a woman named Gidget, whom he had met at a pool hall, and that Gidget and some Asians had forced him to sign over the title to his 1990 Grand Am under threat of death. Shane's mother Anne McInturff made a similar statement the same day. She repeated Shane's story of Gidget, the Asians, and the car, but she added that Shane had told her that Gidget had initially taken his $350 pool cue in satisfaction of the debt. She also said that Shane was

---

[2] Defendant also complains that the court improperly kept him from introducing certain evidence at the sentencing phase. Because we grant relief from his sentences in Part III.D of this opinion, we do not reach this claim. Our discussion here addresses only the guilt-phase exclusion of Defendant's proffered evidence of a third-party culprit.

"scared to death" after losing his car and "would look out the window before answering the door." Supp. Crim. App. Original R. at 16, *State v. Dodd*, No. CF-94-7724 (D. Okla. May 9, 2003). Both parents told the police that the victims had moved into their home while they were away on vacation in June 1994. In addition, Defendant cites the statement of another resident of the victims' apartment complex, who told the police that "on the night of the 6th around 2:00 A.M. (Monday morning),"[3] she was awakened by the sound of a gunshot and then heard people running next to the building "saying something in another language." *Id.* at 33. This resident testified at Defendant's first trial that the language may have been Middle Eastern. Finally, Defendant cites the police statement of a friend of Shane McInturff who said that roughly a week before the murders, Shane had called her to say he had too large a quantity of drugs, needed to get rid of it, and would cut the price on the pot he had. She said that Shane had "sounded very nervous." *Id.* at 36.

The trial court excluded Defendant's proffered evidence of a third-party culprit, ruling that the evidence failed to comply with Oklahoma's overt-act rule.

---

[3] Defendant says that in a later affidavit this witness clarified that she had been awakened in the early morning hours on *Sunday* morning. But because Defendant never presented the affidavit to the OCCA, we may not consider it in deciding whether the OCCA's determination on this issue was contrary to or an unreasonable application of clearly established federal law. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

At the time of trial, Oklahoma courts had interpreted this rule to mean that "evidence offered to show that some other person committed the crime charged must connect such other person with the fact; that is[,] some overt act on the part of another towards the commission of the crime itself." *Dennis v. State*, 879 P.2d 1227, 1232 (Okla. Crim. App. 1994) (internal quotation marks omitted). Evidence showing merely "a possible motive on the part of another," unaccompanied by "evidence of acts or circumstances that tend clearly to point to another, rather than the accused," would not satisfy this rule. *Id.* (internal quotation marks omitted).

On direct appeal the OCCA affirmed the trial court's ruling. It said that Defendant's proffered evidence "not only failed to establish an overt act by a third party, but more fundamentally, it failed to establish an identifiable third party with a motive to harm either [victim]." *Dodd*, 100 P.3d at 1033. It further observed regarding the various items of evidence that "the more specific one item was, the more likely it was inconsistent with the others." *Id.* And it concluded: "Because the proffered evidence was ambiguous and entirely speculative as to a potential alternative suspect, the trial court did not abuse its discretion in excluding it from the guilt stage of trial to avoid confusion of the issues." *Id.* The OCCA then "reject[ed] [Defendant's] claim that barring this evidence violated his constitutional right to a fair trial, because it prevented him from mounting a defense." *Id.* It explained:

[Defendant] has not demonstrated that the general rules of relevancy, codified in our Evidence Code, worked to deny him this right. [Defendant] was simply barred from presenting what, in the trial court's discretionary determination, did not tend to be probative of any fact in issue.

*Id.* The court also emphasized that Defendant had been permitted to put on substantial evidence that someone else must have committed the murders:

[Defendant] was able to present evidence and argument on many of the subjects he lists as alternative-suspect evidence. For example, the jury was made aware that the victims possessed paraphernalia not only for ingesting drugs, but for distributing them as well. Expert testimony showed that some DNA recovered from the bloody hand towel did not match either victim or [Defendant], and that numerous latent fingerprints lifted from the crime scene did not match either the victims or [Defendant.] In addition, [Defendant] presented expert testimony as to the unlikelihood that a lone assailant could have held two victims in submission without restraining them in some manner, and testimony was presented that the manner of killing was reminiscent of gang violence.

*Id.* The court concluded:

Thus, [Defendant] was permitted, within the parameters of the Evidence Code, to advance and attempt to support his claim that a reasonable doubt existed that he was the perpetrator.

*Id.*

## 2. Right to Present a Complete Defense

Defendant argues that the denial of his constitutional claim was contrary to or an unreasonable application of clearly established law set forth in a number of Supreme Court precedents. Two statements by the Court are probably the most helpful to his position. The first is: "Whether rooted directly in the Due Process

-17-

Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (even after trial court had decided that confession was admissible, defendant was constitutionally entitled to put on evidence of circumstances of confession to show that it was unreliable) (citations and internal quotation marks omitted). The second is: "Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (Constitution did not necessarily require admission of evidence of prior sexual relationship between rape victim and defendant when defense did not comply with requirement of notice to prosecution) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987) (rejecting per se rule excluding hypnotically refreshed testimony when applied to defendant's own testimony)).

At the same time, however, the Supreme Court has never questioned the traditional reasons for excluding evidence that may have some relevance. The formulation in Federal Rule of Evidence 403 sets them forth as follows: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

-18-

needlessly presenting cumulative evidence." Fed. R. Evid. 403. Thus, *Crane* said:

> We acknowledge . . . our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence. As we reaffirmed earlier this Term, the Constitution leaves to the judges who must make these decisions "wide latitude" to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Moreover, we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted.

476 U.S. at 689–90.

As the Court recently observed, "[o]nly rarely" has it "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (per curiam). Of the four cases cited by *Jackson* for this proposition, three predated the OCCA's decision in this case. All are readily distinguishable.

In the first, *Washington v. Texas*, 388 U.S. 14, 16 (1967), the defendant wished to call as a witness his previously convicted accomplice, who would testify that the defendant had tried to persuade the accomplice to leave and then fled before the accomplice fired the fatal shot. "It [was] undisputed that [the accomplice's] testimony would have been relevant and material, and that it was

-19-

vital to the defense." *Id.* But under a state rule of evidence, testimony by accomplices was generally excluded. *See id.* at 16–17. The Court held that the rule was absurd, particularly since it had exceptions if the accomplice had been acquitted or was testifying for the prosecution, when the danger of perjury would be enhanced. *See id.* at 22–23. As *Jackson* summarized, the state evidentiary rule in *Washington* "could not be rationally defended." 133 S. Ct. at 1992.

The next cited decision was *Chambers v. Mississippi*, 410 U.S. 284 (1973). The defendant was charged with murder. *See id.* at 287. Another person (McDonald) had made a written confession and had orally confessed to three different friends. *See id.* at 287–89. The defendant called McDonald as a witness, and the written confession was admitted into evidence. *See id.* at 291. On cross-examination the state elicited that McDonald had repudiated the confession, and McDonald explained why he had falsely confessed. *See id.* Defense counsel then sought to cross-examine McDonald as an adverse witness but, because of a state voucher rule forbidding a party to impeach his own witness, he could not cross-examine McDonald about his confessions. *See id.* at 291–92, 295–96. Also, because of the state hearsay rule the defendant was not permitted to call the three friends to testify about McDonald's confessions. *See id.* at 292–93. The Court noted that the state had not sought to defend its voucher rule "or explain its underlying rationale," *id.* at 297, and it held that there were strong indicia of reliability of the oral confessions, *see id.* at 298–303. To

-20-

exclude all this evidence, it ruled, violated the defendant's constitutional right to a fair trial. *See id.* at 302–03.

The third decision was *Rock*. In that case the defendant himself was prevented from testifying to the extent that his memory had been hypnotically refreshed. *See* 483 U.S. at 47–48. The Court held that the state's per se rule excluding hypnotically refreshed memories must yield to an individualized examination of the reliability of the testimony in the particular case. *See id.* at 61–62.

In each of these cases the excluded evidence could not have been more relevant. If believed, the evidence in itself would have established the defendant's innocence. Yet the state court either had provided no rationale for the exclusion, *see Chambers*, 410 U.S. at 297, could not defend an absurd rule, *see Washington*, 388 U.S. at 22–23, or had failed to examine the reliability of the specific evidence in that case, *see Rock*, 483 U.S. at 61–62; *Chambers*, 410 U.S. at 298–303. Not so in this case. The excluded evidence merely suggested the possibility of other culprits. The OCCA examined the evidence and found it "ambiguous and entirely speculative as to a potential alternative suspect." *Dodd*, 100 P.3d at 1033. And, it said, exclusion would eliminate what "amounted only to evidence of the victim's bad character" and would "avoid confusion of the issues." *Id.* Nor did the court rely on a rigid rule to require exclusion. The OCCA noted that "the defense . . . failed to establish an overt act by a third

party," but its analysis of the admissibility of the evidence and Defendant's fair-trial claim addressed traditional factors in evidentiary rulings. *Id.* We may well have ruled differently on the admissibility of the evidence, but the OCCA's assessment of the evidence was not irrational and it did not contradict or unreasonably apply clear Supreme Court precedent.[4]

We briefly address three other decisions on which Defendant relies. He cites *Crane* as supporting his complete-defense argument. The opinion is relevant but unhelpful to Defendant. In *Crane* the state court, after ruling that the defendant's confession was voluntary and therefore admissible, excluded testimony about the circumstances of his confession. *See* 476 U.S. at 684–86. The Supreme Court held that the exclusion violated the defendant's constitutional right to present a complete defense. *See id.* at 690. The evidence was certainly relevant; the defendant could be acquitted only if he could convince the jury that his confession was unreliable. Yet neither the state courts nor the prosecution briefs "advanced any rational justification for the wholesale exclusion of this

---

[4] Defendant argues that in addressing his constitutional claim, the OCCA improperly reviewed the trial court's actions for abuse of discretion. He contends that application of the abuse-of-discretion standard to a constitutional claim is improper, citing *Richie v. Workman*, 599 F.3d 1131, 1137–38 (10th Cir. 2010). But *Richie* was considering only the sufficiency of the evidence to support a lesser-included instruction, an issue we have described as one of law. *See Gilson v. Sirmons*, 520 F.3d 1196, 1234 (10th Cir. 2008). Evidentiary rulings, in contrast, are generally reviewed for abuse of discretion because of the trial judge's superior vantage point in assessing probative value and the considerations favoring exclusion. In any event, a fair reading of the OCCA decision indicates that it was making an independent determination of the relevant factors.

body of potentially exculpatory evidence." *Id.* at 691. Again, the evidence here was not as relevant and there were rational grounds for exclusion.

The other Supreme Court case cited by Defendant, *Holmes v. South Carolina*, 547 U.S. 319 (2006), concerns a relevant legal issue, but because it postdated the OCCA decision in this case it could not establish law benefitting Defendant under § 2254(d)(1). *See Williams*, 529 U.S. at 412. We describe it, however, because it actually weakens Defendant's argument. In *Holmes* a state rule barred evidence that the crime was committed by a third party if there was "'strong forensic evidence'" of the defendant's guilt. 547 U.S. at 324. The Court unanimously held that the evidence could not be excluded because of the strength of the state's case, as opposed to the weakness of the proffered evidence or the risk of undue confusion or the like. *See id.* at 328–31. At the same time, however, it noted the wide acceptance of rules limiting "the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.* at 327. Even by the time of *Holmes* it was not clearly established that all such evidence must be admitted.

Defendant's third case is our decision in *Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999). He relies on the statement in that case that Supreme Court precedents like *Rock* and *Chambers* "make[] clear that a state court may not apply a state rule of evidence in a per se or mechanistic manner so as to infringe upon a defendant's constitutional right to a fundamentally fair trial." *Id.* at 1214. But as

we have just explained, that is not what the OCCA did in Defendant's case. Rather than applying the overt-act rule mechanistically or inflexibly, it analyzed Defendant's evidence on the merits and found it "ambiguous and entirely speculative as to a potential alternative suspect." *Dodd*, 100 P.3d at 1033.

Finally, Defendant argues that regardless of whether the initial evidentiary exclusion was constitutional, during guilt-phase closing arguments the prosecution improperly commented on the absence of evidence of a third-party perpetrator by challenging defense counsel to "cut to the chase" and asking, "What is the reasonable theory of innocence . . . ?" Tr. of Proceedings, Vol. 16 at 105–06, *Dodd*, No. CF-94-7724 (D. Okla. May 30, 2002) (Tr.). These remarks, Defendant suggests, infringed on his constitutional right to present a complete defense because they "double[d] down by highlighting the defense failure to present the very evidence prosecutors succeeded in excluding." Aplt. Br. at 21. He relies on our decision in *Paxton*. We are not persuaded.

After the defendant in *Paxton* had been found guilty of murdering a friend, the prosecution presented evidence during the sentencing stage that he had been charged in the shooting death of his wife years earlier. *See* 199 F.3d at 1202–03. The circumstances of the wife's death occupied "the bulk of the state's evidence" during this stage. *Id.* at 1212. The defendant offered into evidence a court order stating that the charge against him had been dismissed because he had been cleared by a polygraph examination. *See id.* at 1211. But the trial court excluded

-24-

the evidence under a state rule that polygraph results could not be admitted for any purpose. *See id.* At closing argument the prosecutor told the jury that the defendant had failed to introduce any evidence countering the state's version of events and that nobody knew why the charges had been dismissed. *See id.* at 1212–13. We ruled that the evidentiary exclusion had violated the defendant's Eighth Amendment right to present mitigating evidence at the sentencing phase, and that the defendant had been denied his due-process right to explain or deny the evidence against him. *See id.* at 1215–16.

Two key distinctions set *Paxton* apart from this case. First, in *Paxton* the problematic closing argument occurred during the sentencing phase. We substantially relied on Supreme Court cases relating to a defendant's opportunity to present mitigating evidence not admissible under ordinary evidentiary rules. *See id.* at 1213–14.

Second, the prosecutor in *Paxton* outright lied to the jury. He knew the reason why the charges against the defendant had been dismissed; but knowing that evidence of that reason was excluded, he falsely asserted that the reason was unknown. That is not what happened here. Defendant's principal challenge is to the following remarks in the State's closing argument (we emphasize the portions specifically referred to in Defendant's opening brief):

> I know that as you all listen to the argument of Defense Counsel that you're going to be thinking about the evidence in this case. And you could pick this case apart, but I know that the thing

-25-

you're going to want Ms. Hammarsten [defense counsel] or whoever argues over there on their side, is to take a look at that circumstantial evidence case and say, Ms. Hammarsten, from the evidence in the case taken together, *what is the reasonable theory of innocence* consistent with all of the evidence taken together, inconsistent with guilt and consistent with innocence, not picking it apart, not just this or that, Ms. Hammarsten, I think what you all want to know—

[Defense counsel raises objection, which court overrules.]

What you all want Ms. Hammarsten to know when she gets up here, is *let's cut to the chase*, Ms. Hammarsten. *What is the reasonable theory of innocence*, not consistent with one item or two, but consistent with all of the evidence showing that [Defendant], the guy right here, is the one who had the motive, the opportunity, the capacity, and he's the one who did the killer stuff. What is the reasonable theory of innocence? That's, I believe, what you want Ms. Hammarsten to tell you right now.

Tr., Vol. 16 at 105–06 (emphasis added). In rebuttal closing argument the State continued this attack, asserting, "[Y]ou still have no reasonable theories of innocence." *Id.* at 165.

Fairly understood, the State's argument was simply that there was no reasonable view of the evidence other than Defendant's guilt. This was a permissible comment on the evidence at trial. And there was no assertion of a fact known by the prosecutor to be untrue. In particular, the State did not assert that there was no piece of evidence that supported innocence. On the contrary, the closing argument appeared to concede that point. And we cannot say, as was true in *Paxton*, that the prosecution knew that excluded evidence contradicted what was said in closing. Indeed, the prosecutors here could have made the same

argument even if the excluded evidence had been admitted. It would not be unreasonable, as we have already said, to view that evidence as speculative.

Under AEDPA deference we cannot sustain this claim.

### 3. Confrontation Clause

At oral argument before this court, defense counsel's first contention was that the trial court had violated Defendant's rights under the Confrontation Clause by restricting the cross-examination of Anne McInturff, whose son was one of the victims. On direct examination she testified that her son would have told her if he had been in any trouble or needed help and that at the time of his death she had no information suggesting that he was in trouble or danger of any kind. Counsel argued to us that the court should not have forbidden trial counsel from cross-examining her about her statement to the police that her son had been scared to death after the loss of his car. This argument has substantial merit. But it comes too late.

Although one might be able to extract the Confrontation Clause argument from Defendant's opening brief in this court, it was never raised before that. At trial, in responding to the testimony of Anne McInturff, defense counsel re-urged her prior motion to permit evidence of a third-party perpetrator, but she did not distinguish Ms. McInturff's prior inconsistent statement in particular and say that the Confrontation Clause guaranteed Defendant the right to elicit it on cross-examination. And after the motion was denied, defense counsel did not conduct

-27-

any cross-examination of Ms. McInturff.  The trial court would not have been alerted to the special reason to allow cross-examination about the prior inconsistent statement.  Likewise, Defendant's brief on direct appeal to the OCCA mentioned Ms. McInturff's testimony, but the only constitutional claim in that discussion was that the exclusion of substantive evidence had denied Defendant's right to present a complete defense.  Nowhere did Defendant argue that he had *also* been denied the right to cross-examine Ms. McInturff under the Confrontation Clause.  His applications for state postconviction relief contained no Confrontation Clause argument, either.  Nor was the argument raised in federal district court.  We know of no precedent authorizing us to review an issue not exhausted in state court and not presented to the federal district court.

## C.    Prosecutorial Misconduct

Defendant alleges that the prosecution engaged in misconduct at several points in his trial.  The OCCA denied this claim on the merits.  *See Dodd*, 100 P.3d at 1038–41.

"Ordinarily, a prosecutor's misconduct will require reversal of a state court conviction only where the remark sufficiently infected the trial . . . to make it fundamentally unfair, and, therefore, a denial of due process." *Duckett v. Mullin*, 306 F.3d 982, 988 (10th Cir. 2002).  "Nonetheless, when the impropriety complained of effectively deprived the defendant of a specific constitutional right, a habeas claim may be established without requiring proof that the entire

trial was thereby rendered fundamentally unfair." *Id.* (internal quotation marks omitted). Only one of Defendant's claims of misconduct arguably fits the second category. We begin by addressing that claim.

### 1. Statements Relating to the Burden of Proof

Defendant says that at voir dire the prosecutor used certain tactics "to psychologically condition" jurors into thinking that the State need not prove its case beyond a reasonable doubt. Aplt. Br. at 39. The parties agree that the OCCA rejected this claim on the merits, finding no error. It explained that "[t]he prosecutor had a right to find out if any prospective jurors were unable, either as a matter of principle or simple misunderstanding, to give circumstantial evidence the same weight accorded to direct evidence, as the law would require them to do." *Dodd*, 100 P.3d at 1029. Defendant suggests that this analysis was contrary to or an unreasonable application of clearly established federal law. We disagree.

The only Supreme Court opinions that Defendant cites in support of this claim are *In re Winship*, 397 U.S. 358 (1970), and *Taylor v. Kentucky*, 436 U.S. 478 (1978). Neither case governs the issue here. In *Winship* the Court held that a juvenile was denied due process when the state adjudicated him a delinquent under a statute requiring proof by only a preponderance of the evidence, rather than beyond a reasonable doubt. *See* 397 U.S. at 359–61, 368. And in *Taylor* the Court held that the refusal of a trial court to instruct the jury on the presumption of innocence was a violation of due process when the court's instructions on the

-29-

burden of proof were minimal, the prosecutor made remarks suggesting that the defendant's status as a defendant meant that he was guilty, and the jury was permitted to draw inferences of guilt from the fact of defendant's arrest and indictment. *See* 436 U.S. at 486–90. Here, the jury was instructed on the presumption of innocence and that it must find guilt beyond a reasonable doubt. The OCCA's denial of this claim was not contrary to or an unreasonable application of federal law clearly established by the Supreme Court.[5]

### 2. Other Alleged Misconduct

Because Defendant's remaining claims of prosecutorial misconduct do not allege the invasion of a specific constitutional right, he must show that the alleged misconduct "sufficiently infected the trial . . . to make it fundamentally unfair, and, therefore, a denial of due process." *Duckett*, 306 F.3d at 988. "[T]his is a high hurdle." *Banks v. Workman*, 692 F.3d 1133, 1148 (10th Cir. 2012). And it is even higher here because Defendant must show that the OCCA's rejection of his claim was unreasonable under § 2254(d). *See id.* He has failed to do so.

Defendant complains that during the guilt phase the prosecutor improperly introduced, and commented on, what he characterizes as "victim impact testimony" from the victims' family members. Aplt. Br. at 42, 44. He cites

---

[5] In this court Defendant also argues that the prosecutor's closing argument in the trial's guilt phase lowered the burden of proof. The OCCA did not address this claim. That is probably because the claim was not raised in Defendant's brief to the OCCA. In any event, the claim is wholly without merit.

statements by Shane McInturff's parents and Keri Sloniker's mother alluding to their close relationships with the victims; and he cites the following statement by the prosecutor about Keri Sloniker in his guilt-phase closing argument: "On her left-hand was a small little diamond that Shane McInturff had given her that expressed his commitment of his intention to marry her and spend the rest of his life with her. He did, it was just a lot shorter life than any of us thought." Tr., Vol. 16 at 61.

We see no prosecutorial misconduct in the questioning of the witnesses; the questions inquired about matters relevant to establish the witnesses' familiarity with the victims' activities, and the questioning was relatively brief. The prosecutor's comment in closing, however, cannot be defended. He made no effort to tie it to a material fact in the case. Nevertheless, it was brief and isolated, and Defendant did not object. *See Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999) (failure to object, although "not dispositive, is relevant to our assessment of fundamental unfairness"). The OCCA was not unreasonable in refusing to say that the statement rendered the trial fundamentally unfair.

Defendant further complains that while cross-examining him, the prosecutor mentioned that he had been a death-row inmate. But, as the OCCA observed, Defendant himself had already volunteered, while being cross-examined on whether he endorsed statements made on a website supporting him, that a second website was not just for him but "for all the prisoners on death row." Tr.,

Vol. 14 at 160; *see Dodd*, 100 P.3d at 1040.  The prosecutor's statement did not tell jurors anything they did not already know.

As for the prosecution's comments that Al Ames's knife perfectly matched a swipe of blood found on Keri Sloniker's foot, the OCCA recognized that such comments "were at times overstated," *Dodd*, 100 P.3d at 1038, but it noted that the jury had been "instructed that these comments were not evidence," *id.*, that the defense had highlighted the limitations of the evidence on cross-examination, *see id.*, and that the strength of the evidence had been "clarified by considerable forensic expert testimony on the subject," *id.* at 1040–41.  The OCCA reasonably determined that the jury was not misled.

Next, Defendant claims that the prosecution improperly vouched for witnesses by (1) eliciting testimony from investigator Rockie Yardley describing previous cases on which he had worked; (2) eliciting testimony from crime-scene reconstructionist Tom Bevel that one of the prosecutors had met him at the crime scene; and (3) using the phrase "we know" when summarizing the evidence during guilt-phase closing arguments.  "It is clearly impermissible to bolster a State witness by suggesting that information available to the prosecution but not presented to the jury supports the witness's testimony." *Cargle v. Mullin*, 317 F.3d 1196, 1219 (10th Cir. 2003) (citing *United States v. Young*, 470 U.S. 1, 18 (1985)).  Additionally, prosecutors have a "duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal

views on the evidence." *Young*, 470 U.S. at 7. Any failure to observe these principles here, however, did not result in a fundamentally unfair trial. Yardley's testimony about past cases was relevant to establish his expertise. As for Bevel's mention of meeting the prosecutor at the crime scene, even if it could be characterized as improper, it occupied a mere snippet of otherwise appropriate testimony, and defense counsel never objected. Moreover, Defendant has not suggested that the expertise or integrity of Yardley or Bevel was at issue in the case. And as for the prosecutor's use of "we know" in closing, "[s]uch arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." *Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47 (1974). "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id.* at 647.

Defendant also complains of assorted instances of what he describes as "melodramatic, badgering[] conduct" by the prosecutor. Aplt. Br. at 57. Some of this conduct, such as the closing-argument statement that Defendant was a "'brutal amateur'" at killing, the OCCA held to be proper commentary on the evidence presented. *Dodd*, 100 P.3d at 1041. Defendant has offered no Supreme Court authority to the contrary. As for the rest, the OCCA ruled:

-33-

The prosecutor's conduct was at times melodramatic, and his sidebar comments about the defendant's demeanor would have been better reserved for closing argument. The trial in this case was long and sometimes emotional. Counsel for both parties were experienced, prepared, and zealous advocates. That zeal may have overtaken them briefly at times. [Defendant] concedes in his brief that neither side was beyond reproach. We have considered the instances [Defendant] complains of carefully, in light of the entire record, and cannot say that this conduct, alone or in accumulation, affected the outcome of the trial.

*Id.* Our review of the record assures us that this determination was reasonable.

Finally, Defendant claims that during closing argument the prosecutor attempted to mislead jurors regarding a window in the victims' apartment. The apartment's living room had two adjacent windows on the south side of the front door; we will refer to the window closer to the door as the north window and the other as the south window. The victims would sometimes leave one of these windows (presumably, the north window) unlocked so that a person who did not have a door key could open the window, reach in, and unlock the front door. Robert McInturff testified that before entering the apartment with Defendant and discovering the victims, he tried to open the window but found it locked. When police arrived on the scene a short time later, they discovered that the south window was unlocked and ajar by about a millimeter. Defendant claims that the prosecutor improperly argued that while Mr. McInturff was examining the bodies, Defendant unlocked and opened the window that Mr. McInturff had just tried to open.

There are two problems with Defendant's argument. First, the prosecutor did not misstate the evidence. He indeed referred to a window in his closing argument, saying: "There's only one person on the planet who had access and a reason to monkey with that window. It's that guy right there, the killer." Tr., Vol. 16 at 46. But he did not say that "that window" was the one that Mr. McInturff had tried. Although Defendant contends that the prosecutor was deliberately vague, allowing jurors to think that the "access window" had gone from locked to unlocked when, in fact, it had remained locked, Aplt. Br. at 49, we cannot tell from the record whether he indicated nonverbally what window he was referring to or whether any ambiguity in his statement was motivated by a desire to deceive the jury. We think it significant that the argument made by Defendant on direct appeal about the prosecutor's reference to the open window was not that the prosecutor misidentified which window was open but that there was insufficient evidence to support the inference that Defendant unlocked and opened a window.[6] The alleged misdirection by the prosecutor was apparently too subtle to be picked up on by appellate counsel.

---

[6] All that Defendant's direct-appeal brief said on the matter was: "[The prosecutor's] argument that [Defendant] unlocked the window and pulled it ajar was not a reasonable inference from the evidence . . . ." Original Br. at 92, *Dodd v. State*, No. CF-94-7724 (Okla. Crim. App. Oct. 6, 2003) (Direct-Appeal Br.). The issue was developed further in Defendant's second state postconviction proceeding.

Second, even if the prosecutor misidentified which window was ajar, Defendant cannot explain why the issue mattered very much. As the State pointed out in federal district court, the distance from the south side of the south window to the north side of the north window was less than four feet, so if the south window was unlocked, a person could easily reach in and unlock the north window. Nor is it clear what Defendant would think he had to gain by unlocking a window when McInturff knew, and so testified, that it had been locked. The incriminating accusation is simply that Defendant tried to make it seem that someone could have entered the apartment when the door was locked, suggesting that the culprit may not have been let in by the victims. Moreover, defense counsel called this point into doubt in cross-examining investigator Rockie Yardley and during closing argument. She clarified which windows were involved, elicited that no fingerprints were found on the open window, and pointed out that the heavy draperies on the opened window would have made it hard for Defendant to open the window without being noticed by Robert McInturff.

Viewing Defendant's allegations of prosecutorial misconduct as a whole, we cannot say that the OCCA was unreasonable in refusing to hold that the

challenged conduct deprived Defendant of a fundamentally fair trial. Relief on this claim is denied.[7]

### D.    Victim-Impact Testimony

During the sentencing phase the trial court admitted testimony from seven relatives of the victims recommending that Defendant receive the death penalty. Defendant argues that the admission of these sentence recommendations violated the Eighth Amendment's prohibition on cruel and unusual punishment. The OCCA found no constitutional error. *See Dodd*, 100 P.3d at 1046. The federal district court ruled that allowing the witnesses to recommend the death penalty was error under the Eighth Amendment but that the error was harmless. We agree with the district court that the admission of the sentence recommendations violated the Eighth Amendment; but we cannot agree that the constitutional error was harmless.

### 1.    The Sentencing Phase

For each murder count the prosecution alleged the same four aggravating factors: (1) that Defendant had previously been convicted of a felony involving the use or threat of violence to a person; (2) that Defendant had knowingly

---

[7] Defendant alleges two additional examples of prosecutorial misconduct: (1) guilt-phase arguments that the defense had failed to advance a reasonable theory of innocence and (2) sentencing-phase arguments about his personal history. Because we grant relief from Defendant's sentences in Part III.D, we need not address the second issue. And we have dealt with the first in our discussion of the exclusion of evidence of third-party motives to kill the victims.

created a great risk of death to more than one person; (3) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) that a probability existed that Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

After moving successfully to incorporate all evidence and testimony admitted during the guilt phase, the prosecution called eight sentencing-phase witnesses. The first was an officer from the Norman, Oklahoma, police department who recounted Defendant's assault and robbery of a 77-year-old woman 11 years before the murders. His account was consistent with Defendant's guilt-phase testimony that when he was 16 he had participated in an assault and robbery of an elderly woman. The court later admitted a certified copy of the judgment and sentence showing that Defendant had pleaded nolo contendere to robbery with a dangerous weapon and had been sentenced to 10 years' incarceration, nine of which were suspended.

The remaining prosecution witnesses were family members of the murder victims. All witnesses read statements describing the pain, terror, and sadness that the murders had caused them. The statement of the first witness ended with a recommendation of the death penalty. For the other six witnesses, after they had concluded their statements the prosecutor asked if they had recommendations for punishment. Each said that Defendant should be put to death. Shane McInturff's aunt ended her statement by saying: "[Defendant] has been found guilty. His

eternal consequences are out of your hands but his earthly consequences are in yours. I believe the appropriate sentence for [Defendant] is death." Tr., Vol. 17 at 39. His brother testified: "I ask that you would give the death penalty to [Defendant]." *Id*. at 41. His sister testified: "I believe that death is an appropriate sentence for this man." *Id.* at 47. His mother testified: "The only appropriate punishment I can think of is that he should be put to death." *Id.* at 53. His father testified: "I believe the appropriate punishment should be death." *Id.* at 56. Keri Sloniker's sister testified: "He needs to die." *Id.* at 43. And her mother testified: "I think the death penalty would be appropriate for this case." *Id.* at 61.

In mitigation the defense offered testimony from Defendant's grandmother, his parents, and two of his sisters that they loved Defendant and would continue to keep in touch with him if he were sentenced to life in prison, and each urged the jury to spare his life. It also offered the testimony of an official from the Oklahoma Department of Corrections that Defendant had been disciplined only three times while in prison. And an Oklahoma inmate testified about the circumstances of the most serious disciplinary infraction, a fight.

During its first closing argument the prosecution maintained that three of the alleged aggravators—prior violent felony; knowingly creating a great risk of death to more than one person; and murder for the purpose of avoiding or preventing a lawful arrest or prosecution—were easily proved because Defendant

had admitted to the essential elements during his guilt-phase cross-examination. Addressing the fourth alleged aggravator, the probability that Defendant would commit criminal acts of violence that would constitute a continuing threat to society, the prosecution developed the theme that Defendant was a dangerous man who had consistently sought to escape responsibility for his actions. It cited Defendant's past criminal behavior, his dishonesty in police interviews after the murders, and his conduct in prison, including the fight with the inmate and an attempt at suicide with a razor blade.

The defense expounded several points in closing. It reminded the jurors that they need not find mitigating circumstances unanimously or beyond a reasonable doubt. It stressed the limited number and nonegregious nature of Defendant's disciplinary infractions in prison, arguing that Defendant had shown that he could behave and contribute to prison society. It recounted the testimony of Defendant's family. And it invoked Defendant's two daughters, maintaining that Defendant cared for them and that they deserved to have a father.

The prosecution delivered a second closing argument, rehashing many of its earlier points and returning to the theme that Defendant had continually sought to escape responsibility for a violent lifestyle. It also appealed to the victim-impact evidence, although not mentioning the sentencing recommendations of family members.

The jury found two aggravators—Defendant's prior violent-felony conviction and his knowingly creating a great risk of death to more than one person—and recommended the death penalty.

## 2. The Constitutional Violation

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held "that the introduction of a [victim-impact statement] at the sentencing phase of a capital murder trial violates the Eighth Amendment." The victim-impact statement in *Booth* "provided the jury with two types of information. First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant." *Id.* at 502. Four years later the Court overruled *Booth* in part, holding "that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). *Payne* made clear in a footnote, however, that it was not overruling the portion of *Booth* that held unconstitutional "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Id.* at 830 n.2. "The Supreme Court's decision in *Payne* and our own post-*Payne* cases clearly establish that it is a violation of the Eighth Amendment to allow a victim or a victim's family member to comment, during

-41-

second-stage proceedings, on the appropriate sentence for a capital defendant."
*Selsor v. Workman*, 644 F.3d 984, 1026–27 (10th Cir. 2011).

Oklahoma law, however, is to the contrary. It "expressly authorizes the admission of victim impact testimony, including victims' characterization of the crime and opinions as to what sentence a defendant should receive." *Lockett v. Trammel*, 711 F.3d 1218, 1236 (10th Cir. 2013); *see* Okla. Stat. tit. 21, § 142A–8(A) (2010) (providing that "Each victim . . . may present a written victim impact statement" and "[t]he court shall allow the victim impact statement to be read into the record"); *id.* § 142A–1(1) (defining *victim* to include, in cases of homicide, "a surviving family member"); *id.* § 142A–1(8) (defining *victim impact statements* to include "the opinion of the victim of a recommended sentence"). On direct appeal in this case the OCCA rejected Defendant's argument that "the victim impact witnesses should not have been allowed to recommend the death penalty as an appropriate punishment." *Dodd*, 100 P.3d at 1046. It found no error, noting that Oklahoma law "specifically permits such recommendations, and we have cautioned that they should be limited to a straight-forward, concise response to a question asking what the recommendation is or a short statement of recommendation in a written statement, without amplification." *Id.* (internal quotation marks omitted). It concluded: "Those admonitions were observed here. We decline to reconsider our position." *Id.*

The admission of sentencing-phase victim-impact testimony recommending the death penalty violated Defendant's Eighth Amendment rights. By holding otherwise, the OCCA reached "a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see, e.g.*, *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002).

### 3. Harmless Error

The OCCA alternatively conducted a harmless-error analysis, stating that if "there [was] any question as to the propriety of the victim impact evidence," *Dodd*, 100 P.3d at 1046, "any minor impropriety in the victim impact testimony was harmless beyond a reasonable doubt," *id.* at 1047. The federal district court, after holding that the admission of the sentence recommendations had violated clearly established law, likewise ruled the error to be harmless. We disagree.

In reviewing whether the admission of the sentence recommendations was harmless, we apply the standard announced in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), under which "an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (internal quotation marks omitted). We apply this test regardless of whether the state court conducted its own harmless-error review. *See Lott v. Trammell*, 705 F.3d 1167, 1218 (10th Cir. 2013). "A substantial and injurious effect exists if a court finds itself in grave doubt about the effect of the

-43-

error on the jury's sentencing decision." *Lockett*, 711 F.3d at 1232 (brackets and internal quotation mark omitted). We recognize that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (internal quotation marks omitted). Nevertheless, "when a court is in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error as if it affected the verdict." *Fry*, 551 U.S. at 121 n.3 (ellipses and internal quotation marks omitted).

We are at least in equipoise. Our doubts begin with the peculiarity ("chutzpah" may be a better word) of the State's argument in this appeal. It contends that the victims' sentencing recommendations did not have a substantial effect on the sentence even though it went to the extraordinary length of eliciting that recommendation from six, and perhaps seven, of the eight witnesses it called at the sentencing phase of the trial. One family member included her recommendation of the death sentence in the statement she read to the jury. The other six completed their statements and then were asked only one further question by the prosecutor, "Do you have a specific recommendation that you would like to offer the jury on punishment," Tr., Vol. 17 at 41, or the equivalent. This presentation of victim requests for the death penalty was not a one-off or a mere aside. It was a drumbeat. For this court to decide that such testimony did not have a substantial effect on the jury would be to impugn the expertise of a

very experienced and highly successful prosecutor, whose firsthand knowledge of Oklahoma capital juries far exceeded what we could possibly acquire. *Cf. Napue v. Illinois*, 360 U.S. 264, 270–71 (1959) (fact that prosecutor "thought it important to establish before the jury that no official source had promised [leniency to witness]" supported determination that failure to disclose promise of leniency caused trial to be unfair).

This panel is well aware that no prior panel of this court has ruled that victim recommendations of the death penalty required reversal. We have found ten decisions in which we decided that such testimony was harmless. *See Grant v. Trammell*, No. 11-5001, 2013 WL 4105939, at *6–7 (10th Cir. Aug. 15, 2013); *Lockett*, 711 F.3d at 1226, 1238–40; *Lott*, 705 F.3d at 1202, 1214, 1218–19; *DeRosa v. Workman*, 679 F.3d 1196, 1236–37, 1240 (10th Cir. 2012); *Selsor*, 644 F.3d at 1025, 1027; *Welch v. Workman* (*Gary Welch*), 639 F.3d 980, 996–1000, 1002–04 (10th Cir. 2011); *Welch v. Sirmons* (*Frank Welch*), 451 F.3d 675, 703–04 (10th Cir. 2006); *Hooper*, 314 F.3d at 1174; *Willingham v. Mullin*, 296 F.3d 917, 930–32 (10th Cir. 2002); *Hain v. Gibson*, 287 F.3d 1224, 1234–36, 1239–40 (10th Cir. 2002). In nine of them a member of this panel either wrote or joined the decision on harmlessness. This case is different.

It is not just the sheer volume of such testimony. This was also a significantly weaker case for the death penalty. Unlike seven of our precedents, the jury did not find the aggravating circumstance that the murder was "especially

heinous, atrocious, or cruel." *Lockett*, 711 F.3d at 1225 (internal quotation marks omitted); *see id.* at 1228; *see Lott*, 705 F.3d at 1172; *DeRosa*, 679 F.3d at 1219; *Gary Welch*, 639 F.3d at 989–90; *Frank Welch*, 451 F.3d at 681–82; *Willingham*, 296 F.3d at 919; *Hain*, 287 F.3d at 1239–40 (listing the jury's finding of this aggravator as the first factor convincing the court of harmlessness). Nor did it find that Defendant was a continuing threat to society, as in two of the remaining three precedents. *See Grant*, 2013 WL 4105939, at *7 (emphasizing the strength of the evidence that the defendant posed a continuing threat)*; Hooper*, 314 P.3d at 1167. In the only case in which the jury did not find either the especially-heinous or continuing-threat aggravator, the two victim statements "did not expressly refer to [the defendant] being put to death; instead, they both simply stated without embellishment [that] they agreed with the prosecution's 'recommended sentence.'" *Selsor*, 644 F.3d at 1027. Indeed, without denigrating the importance of any aggravating circumstances, we think it worth noting that the two factors found by the jury in this case added little beyond the findings of guilt. The prior-felony aggravator was based on a felony committed 11 years before the murders (and 18 years before the trial), when Defendant was 16. And Defendant "knowingly created a great risk of death to more than one person," *Dodd*, 100 P.3d at 1024, because the jury found that he had murdered the two victims.

Moreover, the guilt of Defendant was not as clear cut as in cases in which we have ruled that victim recommendations were harmless. *See Lott*, 705 F.3d at

1219 (noting "the overwhelming evidence of [the defendant's] guilt of the two rapes/murders, as well as his admitted guilt of the two subsequent rapes"); *Gary Welch*, 639 F.3d at 995 (describing evidence of guilt as "overwhelming"). As the prosecutor explained to the jury, this was a circumstantial case. There was no confession, no eyewitness; and no physical evidence—no fingerprints or DNA or blood evidence—marked Defendant as the culprit. Fingerprints were found on Keri Sloniker's purse and Shane McInturff's wallet, both of which apparently had been rifled through, but they matched neither of the victims nor Defendant and were unidentified. And there was no blood or object used in the murders found in Defendant's apartment, which was next to the victims'. The manner of the murders could also cast doubt on Defendant's guilt. The two victims had their throats slashed yet there were no signs of a struggle, such as defensive wounds or marks on their bodies. Their positions may have suggested that they had been bound, but no binding materials were found and no marks on their bodies showed binding. A defense expert witness provided the common-sense opinion that one person could not have committed such murders by himself. Perhaps Defendant had been extremely careful in making sure he left no physical evidence of his crime; but is such care consistent with the State's theory that Defendant sharpened the murder weapon in the presence of his father-in-law a day or two before the murder and returned it to the owner the day that the bodies were discovered?

The State suggests that the sentencing determination was easy for the jury since it took less than four hours of deliberation. But it does not explain why we should consider this time span to be short; and it does not explain why the deliberations could not have been speeded up by the family members' sentence recommendations.

In sum, we find ourselves "in grave doubt about the effect of the error on the jury's sentencing decision." *Lockett*, 711 F.3d at 1232 (brackets and internal quotation marks omitted). We hold that the admission of the sentence recommendations in this case was not harmless.

## IV. ISSUES ON WHICH DEFENDANT REQUESTS A COA

Defendant requests that his COA be modified to cover three additional claims: (1) admission of improper hearsay and bad-acts evidence; (2) ineffective assistance of trial counsel; and (3) cumulative error.

A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires "a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). In other words, the applicant must show that the district court's resolution of the constitutional claim was either

"debatable or wrong." *Id.* For those of Defendant's claims that the OCCA

adjudicated on the merits, "AEDPA's deferential treatment of state court

decisions must be incorporated into our consideration of [his] request for [a]

COA." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004). We deny the

request to modify the COA.

### A.    Hearsay and Bad-Acts Evidence

Defendant claims that the trial court violated his constitutional rights when

it admitted guilt-phase testimony from Shane McInturff's friend Brian Brown that

(1) McInturff had once said that Defendant owed McInturff $800 for drugs and

(2) McInturff had once told Brown that Defendant had fired a gun in the direction

of a Ferris wheel. The OCCA held that this testimony was improperly admitted

under state law but was harmless. *See Dodd*, 100 P.3d at 1034–36. Although it

did not address Defendant's constitutional arguments, its analysis of harmlessness

is cogent and persuasive. No reasonable jurist could say that admission of the

evidence "had substantial and injurious effect or influence in determining the

jury's verdict." *Fry*, 551 U.S. at 116 (internal quotation marks omitted).

### B.    Ineffective Assistance of Trial Counsel

Defendant claims that his trial counsel was ineffective for (1) failing to

counter the prosecutor's sentencing-phase arguments that Defendant had been

given the chance to lead a good life; (2) failing to respond effectively to the

testimony and argument regarding the windows; and (3) failing to challenge the

State's evidence of his postarrest suicide attempt, then proffering an ineffective jury instruction on the suicide evidence. We deny a COA on all three claims. Because we grant relief from Defendant's death sentences, the first claim is mooted. The district court held that the second claim was procedurally barred by an adequate and independent state-law rule, and Defendant's motion to modify the COA does not explain why that decision was debatable. *See Banks*, 692 F.3d at 1144–47 (Oklahoma procedural bar was adequate and independent). As for the third claim, the district court held that it was procedurally barred in part and that the remainder failed on the merits. Defendant has not shown how the district court's ruling could be debated by a reasonable jurist.

## C.    Cumulative Error

Finally, Defendant raises a claim of cumulative error. Because we grant relief from his sentences, we need not review this claim as it pertains to the sentencing phase of his trial. And no reasonable jurist could debate whether guilt-phase errors cumulatively deprived Defendant of a fair trial.

## V.    CONCLUSION

We AFFIRM the denial of relief on all claims addressed in Parts III.A–C of this opinion. We REVERSE the denial of relief on the victim-impact evidence addressed in Part III.D and REMAND with instructions to grant relief on Defendant's sentences, subject to the State's right to resentence Defendant within

a reasonable time.  We DENY Defendant's request for a COA on the issues

addressed in Part IV.